Robert H. LEWIS, Jr., and Eleanor R. Lewis

v.

The UNITED STATES.

Jacob TUFANO and Helen Tufano

v.

The UNITED STATES.

Nos. 253–63, 254–63.

United States Court of Claims.

Jan. 19, 1968.

William Howard Payne, Washington, D. C., attorney of record, for plaintiffs. John Charles Bennison, Middlesburg, Va., of counsel.

Douglas K. Bemis, with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, SKELTON, and NICHOLS, Judges.

## OPINION

### PER CURIAM:

These cases were referred to Trial Commissioner William E. Day with directions to make findings of fact and recommendation for conclusions of law under the orders of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on December 19, 1966. Exceptions to the commissioner's report and opinion were filed by plaintiff, briefs were filed by the parties and the cases were submitted to the court on oral argument of counsel.

At the oral argument before the court, but not in their briefs or before the commissioner, the plaintiffs urged that, at least with respect to the largest sale of 31½ acres in January 1957, the court should find that they did not hold that tract for sale to customers in the ordinary course of business. However, the court finds no basis in the findings or the record for differentiating this sale from the others, and plaintiffs have brought forward no fact or reason (except mere size) for making a distinction.

Since the court is in agreement with the opinion, findings and recommendation of the commissioner, it hereby adopts the same, together with the preceding paragraph, as the basis for its judgment in these cases as hereinafter set forth. Therefore, plaintiffs are not entitled to recover and the petitions are dismissed.

## FINDINGS OF FACT AND OPINION OF COMMISSIONER

DAY, Commissioner:

1. These two suits, the first brought by Robert H. Lewis (hereinafter called Lewis) and Eleanor R. Lewis, and the second brought by Jacob Tufano (hereinafter called Tufano) and Helen Tufano, were consolidated for purposes of trial.

2. Robert H. Lewis and Eleanor R. Lewis are husband and wife, as they were during the years 1955 through 1957. During the years 1955 through 1957, the Lewises lived in the Town of Monroe, Connecticut, where Lewis was employed during all three years by the Town of Monroe as First Selectman (chief municipal officer) and Road Foreman. Lewis' salary income was $6,386.89 for 1956 and $5,741.43 for 1957. In 1957, Lewis also operated a gas station in Stepney Depot, Connecticut, from which he derived net income of $19.31 in 1957. Lewis had no other income in either 1956 or 1957, other than income from the land, the profits from the sale of which are here at issue. Eleanor H. Lewis' occupation during the years 1955 through 1957 was housewife.

3. Jacob Tufano and Helen Tufano are husband and wife, as they were during the years 1955 through 1957. During the years 1955 through 1957, Tufano was employed as Chief of Police of the Town of Monroe. As such, Tufano's salary income was $4,592.25 for 1956 and $5,023.36 for 1957. In addition, Tufano owned real estate which he rented during 1956 and 1957. In 1956, he owned six buildings with an aggregate cost (or other basis) of $50,393, from which he derived gross rental income of $7,690 and net income of $1,714.95. In 1957, he owned nine buildings with an aggregate cost (or other basis) of $86,681, from which he derived gross rental income of $9,215 and net income of $751.01. Helen

Tufano's occupation during the years 1955 through 1957 was housewife.

4. Early in 1955, Lewis learned that Thomas M. Craemer and Mary E. Brennan were offering for sale at a price of $28,000, certain land in the Town of Monroe (this land is hereinafter called the Craemer property). This consisted of two separate tracts, the larger one containing approximately 60 acres and the smaller one approximately 10 acres. The larger tract was bounded by two town highways—Fan Hill Road on the southwest and Turkey Roost Road for a short distance along the southeast—with the south corner of the land lying at the intersection of the roads. The roads were paved and maintained by the county. In May 1955, there was on the larger tract, only one house (near Fan Hill Road) and no streets into the interior. The larger tract was located in an area that was becoming increasingly favorable for residential development.

5. Lewis told his friend Tufano about the possibility of purchasing the Craemer property.

6. Before purchasing the property, Lewis and Tufano hired a surveyor (Bernard J. Shelomis) to make a survey and map of the larger tract of the Craemer property. Lewis and Tufano instructed Shelomis to lay the tract off into streets and lots, subdividing the property in such a way as to get as many lots as possible out of it. The interior of the tract had never before been been surveyed or laid out in lots, so that Shelomis could take only the outside boundary lines (the perimeter of the property) from previous surveys. The Newtown Savings Bank, from which Lewis and Tufano had arranged to borrow money to purchase the property, required that Lewis and Tufano have a survey made of the boundaries of the property. The bank did not require that Lewis and Tufano have the property laid out as a subdivision, although it suggested such a survey.

7. Shelomis laid out the larger tract into a subdivision of 47 lots, with streets (totaling 4,205 feet) planned for access into the interior. At the time of the survey, Shelomis staked out on the land itself, at least 1,300 feet of a projected street into the property (Lorraine Drive). This first survey was completed by May 6, 1955, and that day Shelomis finished his map of the 60-acre tract, showing the entire parcel laid out in streets and lots as a residential subdivision.

8. Lewis and Tufano called the subdivision thus laid out "Meadowbrook Acres." The name was chosen as an appropriate one for a real estate development. According to Lewis, he and Tufano picked the name "Meadowbrook Acres" for the tract because "It seems to me each development in town has some name for their development, so we did the same." Since the name appears on Shelomis' map that was completed May 6, 1955, Lewis and Tufano had chosen the name for the subdivision by that date. (Hereinafter, the larger tract of the Craemer property will be called Meadowbrook Acres.)

9. On May 19, 1955, Lewis and Tufano went into partnership to buy the Craemer property. The two partners were to share equally expenses and profits. A special bank account was set up in which the funds of the partnership were kept. Although the account was in Tufano's name, Lewis had the right to his proportionate part of it. Proceeds from the sales of land in Meadowbrook Acres were paid into the account and expenses of land transactions, as well as withdrawals of the partners, were paid out. When, in later years, the partnership acquired additional real estate, the special partnership account was used similarly for that land.

10. On May 19, 1955, Lewis and Tufano purchased the Craemer property for $28,000 and received a warranty deed of that date. To pay for the property, Lewis and Tufano obtained from the Newton Savings Bank a $15,000 loan secured by a mortgage on the purchase property, and Tufano obtained from the same bank a $13,000 loan secured by a mortgage on other real estate he owned. Lewis and

Tufano were jointly and severally liable on the $15,000 mortgage. Tufano and his wife were liable on the $13,000 mortgage. Both mortgages bore interest at the rate of 5 percent. The $15,000 mortgage was to be paid out at the rate of $100 per month and the $13,000 mortgage at the rate of $90 per month. In both mortgages, the mortgagors reserved the right to pay all or any part of the debt at any time before maturity. Although the purchase money mortgage contained no release clause, the bank released lots on the Craemer property as Lewis and Tufano sold them off, apparently pursuant to an understanding reached at the time the mortgage was made.

11. Lewis and Tufano sold land from Meadowbrook Acres as follows:

| Description | Date of Sale | Selling Price |
|---|---|---|
| Lot No. 30 | June 15, 1955 | $ 2,000 |
| Lot No. 21 | July 15, 1955 | 1,700 |
| Lot No. 38 | August 12, 1955 | 1,700 |
| Lot No. 22 | September 14, 1955 | 1,700 |
| Lot No. 29 | September 23, 1955 | 2,000 |
| Lot No. 41 | January 25, 1956 | 1,750 |
| Lot No. 42 | January 25, 1956 | 1,750 |
| Lot No. 37 | March 11, 1956 | 1,900 |
| Lot No. 43 | March 15, 1956 | 1,900 |
| Lot No. 19 | May 29, 1956 | 1,500 |
| Lot No. 40 | July 1956 | 2,000 |
| Lot No. 39 | August 2, 1956 | 1,700 |
| Lot No. 36 | October 17, 1956 | 2,500 |
| Lot No. 27 (with house) | October 23, 1956 | 14,500 |
| Lot No. 18 | October 23, 1956 | 1,300 |
| Lot No. 28 | October 24, 1956 | 2,000 |
| 31½ acres | January 18, 1957 | 22,050 |
| Lot No. 20 | April 19, 1957 | 1,600 |

By the above sales, Lewis and Tufano disposed of Meadowbrook Acres in its entirety. After 1957, they owned none of the Craemer property except the separate 10-acre tract. Lot No. 21 and Lot No. 38, the second and third lots sold, were lots to which there was no access except by a street (Lorraine Drive) not yet in existence, but planned by Shelomis.

12. Neither Lewis nor Tufano had a real estate broker's license. They did no advertising by way of signs on the property or newspaper or radio advertising. Soon after Lewis and Tufano purchased the tract, however, it was generally known around Monroe that Lewis and Tufano had lots for sale in Meadowbrook Acres. (The testimony was that in a small town, things get around.) Some prospective purchasers were brought to Lewis and Tufano by real estate agents. In such a case, either Lewis or Tufano would provide the customer with details about the lot in which he was interested, and would show him the land if the customer liked. In the end, Lewis and Tufano sold four or five lots this way. Most of the lots were sold to customers who came direct to Lewis or Tufano. Of course, in that event, either Lewis or Tufano would show the land and conduct all the negotiations for sale himself. Three or four lots were sold to a cousin of Lewis. This cousin would apparently build a house speculatively, sell it, then

purchase another lot. One lot was sold to an uncle of Lewis.

13. Lewis and Tufano had an agreement with Shelomis whereby Shelomis was to stake out lots on the property from time to time and draw up detailed plats of portions of Meadowbrook Acres to be filed with the Town Clerk. The first such detailed map (covering lots numbered 1, 2, 29, 30, 31 and 32) was completed June 17, 1955, and filed with the Town Clerk June 20, 1955. The second detailed map (covering lots numbered 21, 22, 23, 24, 25, 26, 27, 28, 38, 39 and 40) was completed September 23, 1955, and filed with the Town Clerk September 28, 1955. The third detailed map (covering lots numbered 37, 41, 42, 43, 46 and 47) was completed March 9, 1956, and was filed with the Town Clerk March 12, 1956. The fourth detailed map (covering lots numbered 19, 20 and 21) was completed in May 1956, and was filed with the Town Clerk August 29, 1956. The map of the entire Meadowbrook Acres, completed May 6, 1955, was filed with the Town Clerk May 6, 1956. Having the lots surveyed and the maps prepared cost Lewis and Tufano $900.

14. Lewis and Tufano had the underbrush on the lots they were selling cleared from time to time to improve the appearance of the property. Also, they constructed two streets into Meadowbrook Acres to give access to lots they were selling in the interior of the tract. Lorraine Drive was completed for a distance of 890 feet to a point some 200 feet beyond its intersection with Diane Drive. Diane Drive was completed for a distance of 885 feet. Both streets had been laid out by Shelomis in his original survey. The streets were surfaced with tar and three catch basins were built for drainage. The total cost of construction of the streets was $4,208.15.

15. Lewis and Tufano, as a partnership, had net income from the sale of real estate (parcels of land in Meadowbrook Acres) of $7,163.95 in 1955, of $15,488.30 in 1956 and of $12,475.58 in 1957. After taking into consideration expenses of the partnership connected with the improvement and sale of real estate, Lewis and Tufano derived net income from the sale of partnership real estate of $3,314.70 each in 1955, of $5,455.16 each in 1956 and of $5,696.07 each in 1957.

16. Lewis and Tufano filed federal partnership income tax returns for 1955, 1956 and 1957, reporting therein the income from the sale of land in Meadowbrook Acres as partnership income. On the returns for 1955 and 1956, the principal business activity of the partnership was stated to be "Sale of Real Property." In accordance with this assertion, the partnership deducted as business expenses the costs of improvements to Meadowbrook Acres (such as the $4,208.15 for road construction) rather than reducing the gain from the sale of real estate by that amount. The information for the preparation of the partnership returns was supplied by Tufano, and the returns were signed as required, by Tufano, as true, correct and complete. In this matter, Tufano was acting on behalf of both himself and Lewis.

17. The partnership of Lewis and Tufano was not terminated in 1957. It owns the 10 acres of the Craemer property Lewis and Tufano never sold, as well as other real estate subsequently purchased.

18. Lewis and his wife filed joint federal income tax returns for the years 1956 and 1957. On their return for 1956, the Lewises reported as capital gain, Lewis' one-half share of the gross partnership profits from sale of land in Meadowbrook Acres (gross profit being sales price less an allocated portion of the cost of the land and the expense of the sale). On the same return, they reported Lewis' one-half share of partnership expenses (costs of improvements to Meadowbrook Acres) as a deduction from ordinary income. On their return for 1957, the Lewises reported as long-term capital gain, Lewis' one-half share of the gross partnership profits from sale of land in Meadowbrook Acres, less partnership deductions.

19. Tufano and his wife filed joint federal income tax returns for the years 1956 and 1957. On their return for 1956,

the Tufanos reported as capital gain, Tufano's one-half share of the gross partnership profits from the sale of land in Meadowbrook Acres (gross profits being sales price less an allocated portion of the cost of the land and expense of the sale). On the same return, they reported Tufano's one-half share of the partnership expenses (costs of improvements to Meadowbrook Acres) as a deduction from ordinary income. On their return for 1957, the Tufanos reported as capital gain, Tufano's one-half share of the gross partnership profits from the sale of land in Meadowbrook Acres. On the same return, they reported Tufano's one-half share of partnership expenses (expenses connected with Meadowbrook Acres) as a deduction from ordinary income.

20. Upon audit, the Internal Revenue Service assessed deficiencies against both the Lewises and the Tufanos for both 1956 and 1957, on the ground that income from the sale of land in Meadowbrook Acres was ordinary income rather than capital gain. On July 10 and 14, 1959, the Lewises paid a deficiency of $762.29 in tax and $100.66 in interest, relating to the year 1956. On July 10 and 14, 1959, the Lewises paid a deficiency of $739.98 in tax, $64.24 in interest and $7.83 in penalty, relating to the year 1957. On December 1, 1958, the Tufanos paid a deficiency of $781.34 in tax and $69.37 in interest, relating to the year 1956. On March 13, 1959, the Tufanos paid a deficiency of $1,099.91 in tax and $61.01 in interest relating to the year 1957.

21. On January 27, 1960, the Lewises filed claims for refund for 1956 and 1957 on the ground that income from the sale of land in Meadowbrook Acres should be treated as capital gain rather than as ordinary income. On October 16, 1959, the Tufanos filed claims for refund for 1956 and 1957 on the ground that income from the sale of land in Meadowbrook Acres should be treated as capital gain rather than as ordinary income. On March 7, 1962, the Internal Revenue Service denied all four claims.

22. During the time the plaintiffs, Lewis and Tufano, owned the 47 lots and the plotted streets in Meadowbrook Acres, or any of such lots, the property was held primarily for sale to customers in the ordinary course of trade or business.

## MEMORANDUM OPINION

1. The proceeds from the sale of lots by the plaintiffs, Lewis and Tufano, during the years in suit are not entitled to capital gain treatment since the land was held primarily for sale in the usual course of the business of the taxpayers. The ultimate finding is determinative since these capital gain cases turn on the facts. Bauschard v. C. I. R., 6 Cir., 279 F.2d 115, 117 (1960), and cases cited. The word "primarily" as used above, means of first importance or principally, Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966). The section defining a capital asset for capital gain must be narrowly applied and its exclusions interpreted broadly to effectuate basic congressional purpose. Corn Products Refining Co. v. C. I. R., 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29 (1955); C. I. R. v. Gillette Motor Transport, Inc., 364 U.S. 130, 134–135, 80 S. Ct. 1497, 4 L.Ed.2d 1617 (1960); Kaltreider v. C. I. R., 255 F.2d 833 (3d Cir. 1958); Yara Engineering Corp. v. C. I. R., 344 F.2d 113, 114 (3d Cir. 1965).

2. Although the plaintiffs argue strenuously that the primary business of Lewis was as First Selectman and Road Foreman of Monroe, Connecticut, and that of Tufano was as Police Chief of that town, a similar argument was made and rejected in Mathews v. C. I. R., 6 Cir., 315 F.2d 101 (1963), where the taxpayer was a full-time medical doctor who also engaged in the purchase and sale of real estate. In *Bauschard*, supra, the taxpayer was a church pastor.

3. Before the purchase by the plaintiffs of the land involved herein, they had it surveyed and plotted into lots and streets, gave it a subdivision name, and within less than a month, with little or no effort on their part and no advertising by sign on the property or in any other

manner, sold the first lot. One lot was sold in July, one in August and two in September 1955. Eleven lots were sold in 1956, including one on which a house was located (which house was on the property when purchased). In January 1957, the plaintiffs sold a block of plotted lots and streets totaling 31½ acres and in April they sold the last remaining lot in the subdivision. The frequency of sales by the plaintiffs is one of the criteria considered helpful in the ultimate factual determination here. Miller v. United States, 339 F.2d 661, 168 Ct.Cl. 498, 504 (1964).

4. The share of profit from the sale of the lots, to each of the plaintiffs, was closely related dollarwise to the income which one received as Police Chief and the other received as First Selectman and Road Foreman. It exceeded Tufano's Police Chief salary in both 1956 and 1957. It came within $700 of Lewis' 1956 salary of $6,400 and within $45 of Lewis' 1957 salary of $5,740. The Miller case, supra, points to this, also, as one of the criteria to be considered.

5. Considering all of the facts, it is concluded that the plaintiff, Lewis and Tufano, held the lots which they sold in 1956 and 1957 primarily for sale to customers in the regular course of business. Accordingly, gain from such sales must be regarded as ordinary income.

## CONCLUSION OF LAW

On the basis of the foregoing findings of fact and conclusions of law the petitions are dismissed.