## STATLER INDUSTRIES, INC.

### v.

## BOARD OF ENVIRONMENTAL PROTECTION.

Supreme Judicial Court of Maine.

March 6, 1975.

Doyle & Fuller by Jon R. Doyle, Robert G. Fuller, Jr., Augusta, for plaintiff.

John M. R. Paterson, Asst. Atty. Gen., Augusta, for defendant.

ARCHIBALD, Justice.

As a condition precedent to obtaining an exemption from both real estate and sales and use taxes, Statler Industries, Inc. (Statler) requested a certificate from the Board of Environmental Protection (Board) that water and air pollution control facilities in process of installation qualified for tax exemption. The administrative agency refused to issue the certificate and Statler properly sought review thereof pursuant to Rule 80B, M.R.C.P. The complaint having been seasonably initiated and filed in the Kennebec County Superior Court, both Statler and the Board filed opposing motions[1] for summary judgment. Rule 56, M.R.C.P. The Board's motion was denied and Statler's motion was granted, under which the Board was ordered to "grant the certification requested in said complaint to [Statler]." The Board appealed. We sustain the appeal as it relates to granting Statler's motion but deny the appeal as it relates to the decision on the Board's motion.

In order to qualify for tax exemption either at the municipal level with reference to real estate taxes or at the State level with reference to sales and use taxes, an applicant must obtain, as a condition precedent, a certificate from the Board indicating that the pollution control facilities meet the requisite statutory specifications.

We begin our discussion by recognizing the limitations inherent in a ruling on a motion for summary judgment, namely:

"Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."

Rule 56(c), M.R.C.P. Summary judgment may be granted only if there is no genuine issue as to any material fact. Garon v. Glazer, 267 A.2d 381 (Me.1970); Beckwith v. Rossi, 157 Me. 532, 175 A.2d 732 (1961); see Depositors Trust Company v. City of Belfast, 295 A.2d 28 (Me.1972); Eaton v. Miller, 250 A.2d 220 (Me.1969).

Since the motions and supporting affidavits must be juxtaposed with the statutory right to tax exemption, we must be mindful of the wording of the relevant statutes. 36 M.R.S.A. § 656(1)(E) provides:

"The following real estate is exempt from taxation:

.    .    .    .    .    .

1.   Real estate.

E.   Pollution control facilities.

(1) Water pollution control facilities having a capacity to handle at least 4,000 gallons of waste per day, certified as such by the Environmental Improvement Commission, and all parts and accessories thereof.

---

1. Supporting affidavits were attached to each motion, and these will be discussed *infra*.

As used in this paragraph:

(a) 'Facility' means any disposal system or any treatment works, appliance, equipment, machinery, installation or structures installed, acquired or placed in operation *primarily for the purpose* of reducing, controlling or eliminating water pollution caused by industrial, commercial or domestic waste.

(b) 'Disposal system' means any system used *primarily* for disposing of or isolating industrial, commercial or domestic waste and includes thickeners, incinerators, pipelines or conduits, pumping stations, force mains and all other constructions, devices, appurtenances and facilities used for collecting or conducting water borne industrial, commercial or domestic waste to a point of disposal, treatment or isolation, except that which is necessary to the manufacture of products.

.    .    .    .    .    .

(d) 'Treatment works' means any plant, pumping station, reservoir or other works used *primarily for the purpose* of treating, stabilizing, isolating or holding industrial, commercial or domestic waste.

.    .    .    .    .    .

(2) Air pollution control facilities, certified as such by the Environmental Improvement Commission, and all parts and accessories thereof. As used in this paragraph:

(a) 'Facility' means any appliance, equipment, machinery, installation or structures installed, acquired or placed in operation *primarily for the purpose* of reducing, controlling, eliminating or disposing of industrial air pollutants." (Emphasis supplied.)

36 M.R.S.A. § 1760(29), (30) provides:

"No tax on sales, storage or use shall be collected upon or in connection with:

.    .    .    .    .    .

29. Water pollution control facilities. Sales of any water pollution control facility, certified as such by the Environmental Improvement Commission, and any part or accessories thereof, or any materials for the construction, repair or maintenance of such facility.

As used in this subsection:

A. 'Disposal system' means any system used *primarily* for disposing of or isolating industrial or other waste and includes thickeners, incinerators, pipelines or conduits, pumping stations, force mains and all other constructions, devices, appurtenances and facilities used for collecting or conducting water borne industrial or other waste to a point of disposal, treatment or isolation, except that which is necessary to the manufacture of products.

B. 'Facility' means any disposal system or any treatment works, appliance, equipment, machinery, installation or structures installed, acquired or placed in operation *primarily for the purpose* of reducing, controlling or eliminating water pollution caused by industrial or other waste, except septic tanks and the pipelines and leach fields connected or appurtenant thereto.

.    .    .    .    .    .

D. 'Treatment works' means any plant, pumping station, reservoir or other works used *primarily for the purpose* of treating, stabilizing, isolating or holding industrial or other waste.'

.    .    .    .    .    .

30. Air pollution control facilities. Sale of any air pollution control facility, certified as such by the Environmental Improvement Commission, and any part or accessories thereof, or any materials for the construction, repair or maintenance thereof.

As used in this subsection:

A. 'Facility' means any appliance, equipment, machinery, installation or

structures installed, acquired or placed in operation *primarily for the purpose* of reducing, controlling, eliminating or disposing of industrial or other air pollutants." (Emphasis supplied.)

We must determine if any genuine issue of fact stood unresolved as the issues were poised before the Justice below. In order to do so we need to understand the limited conditions under which the Legislature mandated a tax exemption for either real estate or sales and use tax. Of necessity, this entails an analysis of 36 M.R.S.A. §§ 656(1)(E) and 1760(29), (30), quoted above.

We are guided by several well established principles of statutory construction.

"[U]nless inconsistent with the plain meaning of an enactment, words and phrases shall be construed according to the common meaning of the language. 1 M.R.S.A. § 72(3) . . . . Statutes . . . should be read according to the natural and most obvious import of the language without resort to subtle and forced constructions for the purpose of either limiting or extending their operation, where there is no manifest legislative intent contrariwise. . . . Furthermore in construing legislative acts, all parts thereof must be taken into consideration to ascertain legislative intent. . . ."

Frost v. Lucey, 231 A.2d 441, 446 (Me. 1967) ; *see* Mellott v. Sullivan Ford Sales, 236 A.2d 68, 80, 81 (Me.1967) (dissenting opinion of Dufresne, J.).

■ It is self-evident that tax exemption was not to be extended to pollution control facilities generally but only to those utilized *primarily for the purpose* of pollution abatement. The Legislature has used no language which indicates an intention that the phrase be given a unique or particular meaning. Construed in accordance with common meaning, this phrase connotes a basic, fundamental or principal purpose as opposed to one which is secondary or merely incidental.[2] Thus, we construe the statutory language as allowing a tax exemption to those pollution abatement facilities which are basic or fundamental to the control, reduction or elimination of either water or air pollution caused by industrial waste.

■ The Legislature determined that industrial waste was a major contributing factor to water and air pollution. Additionally, it recognized the existing deficiencies of industrial plants in controlling and eliminating both water and air pollution. To strike at this source an incentive was necessary, and tax exemption was a method which the Legislature deemed appropriate. However, from reading both statutes in their totality, the tax exemption was extended only to those facilities which were "installed, acquired or placed in operation" for the *primary purpose* of attaining pollution abatement. It thus becomes clear that the Legislature did not intend to extend tax exemption to such equipment so purchased or installed unless such was its basic function.

The Board's motion for summary judgment was accompanied by the supporting affidavit of the Commissioner of the Maine Department of Environmental Protection, who is likewise an ex-officio member of the Board. 38 M.R.S.A. §§ 342, 361.[3] This affidavit recited that the equip-

2. 20th Century Manufacturing Company v. United States, 444 F.2d 1109, 195 Ct.Cl. 295 (1971) ; Breen v. Industrial Accident Board, 150 Mont. 463, 436 P.2d 701, 706 (1968) ; Mid-South Chemical Corp. v. Carpentier, 14 Ill.2d 514, 153 N.E.2d 72 (1958) ; Pacific Northwest Alloys v. State, 49 Wash. 2d 702, 306 P.2d 197 (1957) ; *see* Lewis v. United States, 389 F.2d 818, 182 Ct.Cl. 426 (1968).

3. The Board consists of 10 members appointed by the Governor with the advice and consent of the Council, "2 of whom shall represent manufacturing interests of the State, 2 of whom shall be representatives of municipalities, 2 of whom shall represent the

ment for which certification was sought was installed by Statler *"primarily for the purpose* of reducing, controlling or eliminating water and air pollution created by industrial waste," and described the equipment as *"process* equipment to replace a portion of an existing paper making process and *will be used to make paper pulp, for use in the paper making operation of Statler."* (Emphasis supplied.)

Likewise annexed to the Board's motion was the formal application of Statler for a certificate of tax exemption, which described the equipment as "repulpers and building to house equipment and materials, piping, valves, and related equipment." Statler outlined therein the proposed function of the equipment as follows:

"The groundwood, sulfite pulp mills and bleach plants are being shut down to reduce pollution. This equipment will provide alternate means of maintaining plant in operation by providing repulped fiber."

Statler's motion for summary judgment placed basic reliance on the affidavit of the Chairman of the Board (quoted *supra*), arguing the Board, through this affidavit, has admitted the essential prerequisite for tax exemption, namely, that the *primary purpose* of the proposed installation was for pollution abatement.

Additionally, Statler's motion included the affidavit of its mill superintendent, reciting:

"2. In its program of achieving compliance with Maine's environmental standards, Statler considered two alternative solutions; a sulfite recovery operation and a deinking/repulping operation. The first alternative would have recovered spent sulfite liquor. The second alternative, and the one ultimately

adopted by Statler, repulps used paper and removes printing ink, coating and filler.

3. Statler's decision to switch to repulping was not made because of any desire on its part to modernize, improve or make more profitable its production facilities. It was made, rather, because of the requirements of Maine's environmental laws and because it provided the best practicable treatment, in Statler's judgment, of its effluent discharges and atmospheric emissions.

4. The equipment for which certification is sought will not make Statler's operations more profitable nor will it provide any significant production economies. It is simply intended to reduce, eliminate or control effluent discharges and atmospheric emissions, and was purchased and installed for such purpose."

We must now inquire whether any critical facts were in dispute on the record thus presented to the Justice below. As we have pointed out, the Legislature sought to reward pollution abatement efforts with tax exemptions but, equally clear, is the intent to limit such exemption to facilities which *primarily* serve that basic purpose. As we see it, factual problems may arise when a given type of installation serves a dual purpose, i. e., it is vital to the production of a manufactured product but, in the process of such manufacture, also serves to reduce either water or air pollution.

Reverting to the content of the motions and accompanying affidavits, we note inconsistent language. For example, in Statler's application to the Board for the exemption certificate it seems apparent that the equipment described therein could serve a dual purpose, namely, to maintain the operative output of the plant by pro-

public generally, 2 of whom shall represent the conservation interests in the State and 2 other members knowledgeable in matters relating to air pollution, and the Commissioner of Environmental Protection ex officio." 38 M.R.S.A. § 361.

The Commissioner serves as Chairman of the Board and he has "the right to vote only in the case of a tie vote." 38 M.R.S.A. § 342.

viding repulped fiber and also to reduce the pollution loads caused by that manufacturing process. We might ask (based on the record), will the facility to be purchased and installed ("repulpers and building to house equipment and materials, piping, valves and related equipment") serve primarily to produce repulped fiber? If not, what segment or segments thereof relate fundamentally to pollution abatement? It is hard for us to visualize a "repulper" that does not convert raw materials into a condition where the fibers may be used to produce paper. If such is its use, it would appear to be indispensable to the manufacturing process, although it may well be that contained within this equipment is a process which serves the primary purpose of eliminating industrial effluent.

Reading the affidavit of the mill superintendent (quoted *supra*) makes it clear to us that Statler was faced with the alternative of either closing its mill or bringing its operation into compliance with environmental standards. We would be less than realistic if we accepted the argument that Statler purchased this new equipment only for purposes of pollution abatement. Obviously, Statler wanted to remain in business and continue to manufacture and sell its various paper products.

■ Thus, it appears to us that there is a vital question unresolved, namely, what segment, if any, of the equipment will be used *secondarily* to the manufacturing process and *primarily* for pollution abatement?

Statler has argued that the Chairman of the Board, in his affidavit, has conceded the right to a tax exemption certificate by describing the equipment as being installed "primarily for the purpose of" pollution abatement. We do not ascribe such significance to the affidavit. Initially, we note that the Chairman serves as a member of the Board only in an ex-officio capacity and has no vote except "in the case of a tie vote." His affidavit does not recite that he is authorized to speak for the ten voting members of the Board, nor does it suggest that the Board, after a hearing, determined that the proposed installation served the primary purpose of pollution abatement.

Additionally, another paragraph of this affidavit describes the equipment as "process equipment to replace a portion of an existing paper making process and *will be used to make paper pulp for use in the paper-making operation of Statler*." (Emphasis supplied.) At best, the Chairman's affidavit in its totality is ambiguous, and could well be merely an expression of his personal judgment.

In summary, since critical factual issues were unresolved on the record before the Justice below, the granting of summary judgment on Statler's motion was error. The entry is:

Appeal sustained as it relates to granting Statler's motion. Appeal denied as it relates to the denial of the Board's motion. Ordered remanded to the Superior Court for further proceedings.

WERNICK, J., sat at argument but did not participate further in the opinion.

All Justices concurring.