**INTERNATIONAL PAPER CO.**

**v.**

**BOARD OF ENVIRONMENTAL PROTECTION, et al.**

Supreme Judicial Court of Maine.

Argued April 28, 1993.

Decided Aug. 2, 1993.

James G. Good (orally), Sarah H. Beard, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, for plaintiff.

Leanne Robbin (orally), Asst. Atty. Gen., Augusta, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, COLLINS, RUDMAN and DANA, JJ.

COLLINS, Justice.

International Paper Company (IP) appeals from the Superior Court (Kennebec County, *Alexander, J.*) judgment affirming the Board of Environmental Protection's refusal to certify IP's sludge/bark dryer

and related equipment as a "water pollution control facility" for tax exemption purposes pursuant to 36 M.R.S.A. §§ 655(1)(N), 656(1)(E)(1), & 1760(29) (1990).[1] We vacate the judgment.

In its normal course of operations, IP generates water pollutants. To treat the wastewater leaving the plant, IP puts this water first into clarifiers in which some pollutants settle out of the water as sludge.[2] The sludge leaving the clarifiers contains about 75% water and is transported to sludge presses where water is pressed out of the sludge leaving the sludge no longer free-flowing and with a water content of approximately 60%. IP formerly disposed of the sludge at this stage by transporting it to landfills. It now has chosen incineration as its method of disposal.

IP already had an incinerator in place with which it disposed of waste bark and produced steam-generated power for the plant.[3] The sludge leaving the sludge presses contained too much water to be burned in the waste-fuel incinerator. In order to dry the sludge enough to facilitate its incineration, IP purchased and installed a sludge dryer which reduces the water content of the sludge to about 40% enabling it to be burned in a mixture of about 65% bark and 35% sludge. IP mixes the sludge with bark prior to its entry into the sludge dryer to make handling the sludge more efficient.

Water pollution control facilities, certified as such by the Commissioner of Environmental Protection, are exempt from property, sales, and use taxes. 36 M.R.S.A. §§ 655(1)(N), 656(1)(E), & 1760(29) (1990). IP asked the Department of Environmental Protection to certify the sludge/bark dryer, conveyors, and ash-handling system as a tax-exempt water pollution control facility. Despite the Commissioner's finding that the "primary purpose of installing the sludge/bark dryer [was] to dispose of or eliminate wastewater treatment sludge," he denied IP's request based on his conclusion that sludge with a 60% water content is "not water pollution."

IP appealed the Commissioner's decision to the Board of Environmental Protection. The Board agreed with the Commissioner and held that, because the sludge entering the dryer had "insufficient liquid content to be free flowing" and was not "water borne industrial waste," it was no longer water pollution, and had become instead, solid waste. The Board stated that:

> Sludge does not become "water pollution" merely because it originates at the

---

1. 36 M.R.S.A. §§ 655(1)(N) & 656(1)(E)(1) exempt from property and real estate taxes water pollution control facilities "having a capacity to handle at least 4,000 gallons of waste per day, certified as such by the Commissioner of Environmental Protection, and all parts and accessories thereof." Those sections further define "facility" as:

 [A]ny disposal system or any treatment works, appliance, equipment, machinery, installation or structures installed, acquired or placed in operation primarily for the purpose of reducing, controlling or eliminating water pollution caused by industrial, commercial or domestic waste.

 36 M.R.S.A. § 656(1)(E)(1)(a) (1990).

 36 M.R.S.A. § 1760(29) exempts from sales, use, and storage taxes, "[s]ales of any water pollution control facility, certified as such by the Commission of Environmental Protection, and any part or accessories thereof, or any materials for the construction, repair or maintenance of a facility." This section defines "facility" as:

 [A]ny disposal system or any treatment works, appliance, equipment, machinery, installation or structures installed, acquired or placed in operation primarily for the purpose of reducing, controlling or eliminating water pollution caused by industrial or other waste, except septic tanks and the pipelines and leach fields connected or appurtenant thereto. 36 M.R.S.A. § 1760(29)(B) (1990).

2. "[T]he term 'sludge' means any solid, semisolid, or liquid waste generated from a municipal, commercial, or industrial waste water treatment plant, or air pollution control facility or any other such waste having similar characteristics and effects." William H. Rodgers, Jr., 2 *Environmental Law* § 4.15, at 232 n. 4 (quoting 42 U.S.C.A. § 6903(26A)). Sludge varies widely in moisture content and may be "quite dry" or contain up to 99% water. *Id.* at 232.

3. IP did not seek tax exempt status for its incinerator as a water pollution control facility because it was originally installed primarily to burn waste bark to produce energy. That continues to be its primary function.

water treatment plant. [The sludge entering the dryer] is a concentration of water pollutants to a point where those pollutants [have] become a solid waste, rather than bits of solids suspended in a liquid.

The Board continued, distinguishing the sludge dryer from the already-tax-exempt sludge presses, by saying, "[t]he fundamental distinction between the ... press [and] the dryer is that the material flowing to the ... press is a liquid waste and the material going to the dryer is a solid waste." The Board affirmed the Commissioner's decision concluding that the sludge/bark dryer "operates to enhance solid waste disposal, not [to] reduce[,] control or eliminate water pollution." IP appealed the Board's decision to the Superior Court pursuant to M.R.Civ.P. 80C. The Superior Court (Kennebec County, *Alexander, J.*) affirmed the Board's decision and, from that decision, IP appeals.

36 M.R.S.A. § 1760 provides that "[n]o tax on sales, storage or use shall be collected upon or in connection with:"

**29. Water pollution control facilities.** Sales of any water pollution control facility, certified as such by the Commissioner of Environmental Protection, and any part or accessories thereof, or any materials for the construction, repair or maintenance of a facility.

As used in this subsection, unless the context otherwise indicates, the following terms have the following meanings.

**A.** "Disposal system" means any system used primarily for disposing of or isolating industrial or other waste and includes thickeners, incinerators, pipelines or conduits, pumping stations, force mains and all other constructions, devices, appurtenances and facilities used for collecting or conducting water borne industrial or other waste to a point of disposal, treatment or isolation, except that which is necessary to the manufacture of products.

**B.** "Facility" means any disposal system or any treatment works, appliance, equipment, machinery, installation or structures installed, acquired or placed in operation primarily for the purpose of reducing, controlling or eliminating water pollution caused by industrial or other waste, ....

**C.** "Industrial waste" means any liquid, gaseous or solid waste substance capable of polluting the waters of the State and resulting from any process, or the development of any process, of industry or manufacture.

**D.** "Treatment works" means any plant, pumping station, reservoir or other works used primarily for the purpose of treating, stabilizing, isolating or holding industrial or other waste.

36 M.R.S.A. § 1760(29) (1990). Sections 655 and 656 allow real estate and property tax exemptions for water pollution control facilities. *See* 36 M.R.S.A. §§ 655(1)(N) & 656(1)(E)(1) (1990). These sections define water pollution control facilities in essentially the same way as section 1760(29) except for the additional requirement that the facility "hav[e] a capacity to handle at least 4,000 gallons of waste per day." 36 M.R.S.A. § 656(1)(E)(1) (1990).

The parties agree that the "primary purpose of installing the sludge/bark dryer [was] to dispose of or eliminate wastewater treatment sludge." The parties disagree whether the sludge entering the dryer, with its 60% water content, is "water pollution" according to the tax exemption statutes. IP asserts that the Board's requirement that waste entering the device be "water borne," is inconsistent with the statute's express inclusion of "incinerators" in the definition of "disposal system" because no incinerator can burn "free-flowing" wastewater.

 On an appeal from an intermediate appellate review of an administrative decision, we review the agency decision directly for an abuse of discretion, errors of law, or findings not supported by the evidence. *Abbott v. Commissioner of Inland Fisheries and Wildlife*, 623 A.2d 1273, 1275 (Me.1993). When interpreting statutes, we "seek to discern from the plain language the real purpose of the legislation, avoiding results that are absurd, in-

consistent, unreasonable, or illogical." *Mahaney v. State*, 610 A.2d 738, 741 (Me. 1992). When the dispute involves an agency's interpretation of a statute administered by it, as is the case here, the agency's interpretation, although not conclusive on the court, is entitled to great deference and will be upheld unless the statute plainly compels a contrary result. *Abbott v. Commissioner of Inland Fisheries and Wildlife*, 623 A.2d at 1275. An exemption from taxation, although entitled to reasonable interpretation in accordance with the purpose of the exemption, is not to be extended by application to situations not clearly coming within the scope of the exemption provisions. *Robbins v. State Tax Assessor*, 536 A.2d 1127, 1128 (Me.1988).

The statutes at hand do not define water pollution. We have noted that one authority has defined water pollution as "any man-made alteration of the quality of the water that appreciably impairs its usefulness for a particular purpose." *Ethyl Corp. v. Adams*, 375 A.2d 1065, 1077 (Me. 1977) (quoting 3 *Waters and Water Rights* 5 (B. Grindler ed. 1967)). Neither the statute nor the definition cited in *Ethyl Corp.* directly answers the question before us, whether water pollution must be waterborne. As IP correctly points out, the statute does expressly include the term "incinerators" in the definition of disposal systems. At the hearing before the Board, the staff witness conceded that its interpretation of the term water pollution as "water borne" is in conflict with the inclusion

of the term incinerator in the definition of "disposal system." [4]

The definition of "disposal system" also, however, contains the words "water borne:"

"Disposal system" means any system used primarily for disposing of or isolating industrial or other waste and includes thickeners, *incinerators*, pipelines or conduits, pumping stations, force mains and all other constructions, devices, appurtenances and facilities used for collecting or conducting *water borne* industrial or other waste to a point of disposal, treatment or isolation, except that which is necessary to the manufacture of products.

36 M.R.S.A. § 1760(29)(A) (1990) (emphasis added). IP explains this apparent inconsistency by asserting that the words "water borne" "modify only the clause 'all other constructions, devises, appurtenances and facilities used for collecting or conducting.'" In other words, under IP's interpretation, only that waste collected or conducted on "all other constructions, devices, appurtenances and facilities" must be "water borne."

We find IP's interpretation of the statute, i.e., that water pollution under the terms of these tax exemptions may include water pollutants that are no longer waterborne or free-flowing, better harmonizes all parts of the statute and avoids a result clearly inconsistent with the plain language of the exemption. We have held that "in construing legislative acts, all parts thereof

**4.** The following exchange took place at the hearing:

[Q]. ... Can any incinerator be exempt?
[Department staff]: Well, again, I don't know. I think it would be difficult ... to say that this incinerator ... isn't a water pollution control facility in [the] sense of burning sludge. The incinerator itself is not what the issue is here and that's not what they're seeking exemption for, it's the dryer which is going to dry this sludge so it can be burned in the incinerator. I don't know that the incinerator itself could be exempt.
Q. ... what if [the incinerator] were built for sludge only[?]
[Department staff]: Well, again I think under the interpretation that the Department is proposing, no, it could not because basically

[you're] burning solid waste, and I realize that, yes, you have to get it to the solid waste stage before you can burn it ... it would be difficult to burn raw water. I'm not sure how that could be read in conjunction with part of that same definition that says [it's] water borne.
Q. Well, how might you explain the fact that the word incinerators is used[?]
[Department staff]: Again, I think it would be difficult to read that in conjunction with ...
Q. What you're suggesting is that the Legislature didn't know what it was talking about?
[Department staff]: I wouldn't begin to suggest anything like that. I think there's, at least from the Department's perspective, those things conflict from a practical perspective.

must be taken into consideration to determine legislative intent." *Statler Indus., Inc. v. Board of Envtl. Protection,* 333 A.2d 703, 706 (Me.1975) (quoting *Frost v. Lucey,* 231 A.2d 441, 446 (Me.1967)). Adopting the Board's interpretation would effectively delete the word "incinerators" from the statute. Such an interpretation is clearly in conflict with the plain language of the statute. The Legislature's express inclusion of incinerators as water pollution control facilities makes it clear that it intended to exempt disposal systems for all forms of water pollution. IP's interpretation is, therefore, also not an extension of these tax exemptions to situations not clearly coming within the scope of the exemption provisions. *Robbins v. State Tax Assessor,* 536 A.2d at 1128.

Our decision is further consistent with the Legislature's statement, "[i]t is hoped that such exemption[s] will encourage more widespread use of modern waste disposal systems and thus improve the quality of the state's water and air." L.D. 72, Statement of Fact (106th Legis.1973). The problem of sludge disposal is growing exponentially, partly in relation to the imposition of stricter water pollution controls. 2 *Environmental Law* § 4.15, at 232–33. In fact, nine industries alone (one of which is the pulp and paper industry) generate 21.5 million tons of sludge and brine annually. *Id.* at 233 n. 13. If this sludge and brine were disposed of on land, at a concentration of 75% water, an area of 100 square miles one foot deep would be required each year. *Id.* IP formerly disposed of its sludge with 75% water in land fills but updated its disposal system to use an incineration approach instead. We think that this is precisely the type of modern system that the Legislature had in mind when it adopted the tax exemptions for water pollution control facilities in 36 M.R.S.A. §§ 655, 656, & 1760 (1990).

The entry is:

Judgment vacated and remanded to the Superior Court for remand to the Department of Environmental Protection for further proceedings consistent with this opinion.

All concurring.