1999 ME 135

**INTERNATIONAL PAPER COMPANY**

v.

**BOARD OF ENVIRONMENTAL
PROTECTION et al.**

Supreme Judicial Court of Maine.

Argued June 8, 1999.

Decided Sept. 15, 1999.

James T. Kilbreth (orally), Sean Mahoney, Verrill & Dana, LLP, Portland, for plaintiff.

Andrew Ketterer, Atty. Gen., John H. Edwards, Asst. Atty. Gen. (orally), Augusta, for B.E.P., defendant.

Gerald F. Petrucelli (orally), Petrucelli & Martin, LLP, Portland, for Town of Jay, defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, SAUFLEY, and ALEXANDER, JJ.

ALEXANDER, J.

[¶ 1] International Paper Company and the Town of Jay (the Town) appeal from a judgment entered in the Superior Court (Kennebec County, *Humphrey, J.*) in a Rule 80C appeal, affirming in part a ruling by the Board of Environmental Protection (the Board) on International Paper's applications for pollution control tax exemption certifications for an elemental chlorine free (ECF) system and a low

nitrogen oxide (NOx) burner system.[1] International Paper appeals from the court's decision affirming the Board's denial of pollution control tax exemption certification for International Paper's ECF system. *See* 36 M.R.S.A. §§ 655(1)(N), 656(1)(E)(1) (1990). The Town appeals from the Superior Court's decision affirming the Board's approval of pollution control tax exemption certification for International Paper's low NOx burner system. *See* 36 M.R.S.A. §§ 655(1)(N), 656(1)(E)(2). Because the Board did not determine whether the ECF system was "installed ... primarily for the purpose of reducing, controlling or eliminating water pollution" as required by section 656, we vacate that part of the court's judgment addressing the ECF system. Otherwise, we affirm the judgment.

## I. BACKGROUND INFORMATION

[¶ 2] International Paper owns and operates a pulp and paper mill in the Town of Jay. This case arises out of applications that International Paper filed in late January of 1997 with the Department of Environmental Protection (the Department) to receive personal property and real estate tax exemption certification pursuant to 36 M.R.S.A. §§ 655(1)(N) and 656(1)(E) for an ECF system and a low NOx burner system it installed in the mill.

[¶ 3] Two bleach plants at the mill are used to remove lignin from the hardwood and softwood pulp and to brighten the fiber that is used to produce paper. International Paper eliminated the use of elemental chlorine in these bleach plants and the pulp bleaching system by installing the ECF system. The system makes it possible to brighten fiber for paper production without discharging, or discharging substantially less, dioxin, furans, and other chemicals into the Androscoggin River.

[¶ 4] International Paper installed the low NOx burner system in two of the mill's power boilers. This system improves combustion by controlling the formation of nitrogen oxide, thereby reducing or eliminating high temperature zones in the vicinity of the burners. By regulating the high temperature zones, the low NOx burner system controls and reduces nitrogen oxide emissions.

[¶ 5] The Commissioner of the Department certified the ECF system as a water pollution control facility and the NOx burner system as an air pollution control facility qualifying for tax exemption. The Town appealed the Commissioner's decision to the Board.

[¶ 6] The Board affirmed the Commissioner's certification of the low NOx burner system. It found that the system has two purposes: (1) assisting with fuel and air delivery to the power boilers; and (2) reducing air pollution by reducing the creation of nitrogen oxide. The Board then found that the NOx system was "installed primarily for the purpose of reducing, controlling or eliminating industrial air pollutants."

[¶ 7] The Board vacated the Commissioner's certification of the ECF system. As with the NOx system, it identified two purposes of the ECF system. Those purposes were: (1) bleaching pulp for the production of paper; and (2) reducing water pollution by eliminating the use of elemental chlorine. The Board then found that:

> Production, namely bleaching pulp, is the basic function of each of these pieces of equipment. Pollution reduction, control and elimination by the substitution of chlorine dioxide for elemental chlorine is coincident to the basic function of these production facilities. The primary purpose of this equipment is therefore bleaching pulp as part of the Mill's paper production process.

Unlike the findings regarding the NOx system, the Board's findings never ad-

---

1. International Paper does not appeal the Superior Court's decision that a sawdust con-

tainment system that it installed does not qualify for a tax exemption certification.

dressed International Paper's purpose for the installation of the ECF system.

[¶ 8] Based on these findings, the Board concluded that: "The [Town] demonstrated that the [ECF systems] were not installed, acquired, or placed in operation primarily for the purpose of reducing, controlling or eliminating water pollution caused by industrial waste." This conclusion, using language taken directly from 36 M.R.S.A. § 656(1)(E)(1)(a), was not supported by any finding regarding the purpose of the installation. The Board also found that although the ECF system contributes to the production of approximately eight million gallons of wastewater per day, it does not have "the capacity to handle 4,000 gallons of waste per day" as required by 36 M.R.S.A. § 656(1)(E)(1).

[¶ 9] Pursuant to M.R. Civ. P. 80C, International Paper appealed the Board's decision about the ECF system and the Town appealed the Board's decision about the low NOx burner system. The Superior Court (Kennebec County, *Marden, J.*) consolidated the appeals. The Superior Court (*Humphrey, J.*) then affirmed both of the Board's decisions. This appeal by the Town and International Paper followed.

## II.  ELEMENTAL CHLORINE SYSTEM

[¶ 10] On an appeal from an intermediate appellate review of an administrative decision, we directly review an agency's decision for an abuse of discretion, error of law, or findings not supported by the evidence. *See Herrick v. Town of*

*Mechanic Falls,* 673 A.2d 1348, 1349 (Me. 1996). International Paper challenges the Board's conclusion that the ECF system was not installed primarily for the purpose of pollution control.

[¶ 11] A taxpayer protesting the imposition of a tax has the burden of satisfying the Board that its request falls within the scope of the claimed exemption. *See SST & S, Inc. v. State Tax Assessor,* 675 A.2d 518, 521 (Me.1996). Upon review, the burden of persuasion rests upon the party seeking to overturn an agency's decision. *See Bischoff v. Board of Trustees,* 661 A.2d 167, 170 (Me.1995).

[¶ 12] This case involves the Board's construction of subsection 656(1)(E)(1)(a), in particular, the phrase "installed ... primarily for the purpose of" abating pollution and the Board's conclusion that the ECF system was installed primarily for the purpose of production. *See* 36 M.R.S.A. § 656(1)(E)(1)(a) (1990).[2] From the Board's written decision, it appears that once the Board determined the ECF system's basic function was production, it ceased its inquiry into whether pollution abatement or production was the primary purpose for its installation. Unlike its decision regarding the NOx system, it did not proceed to examine the purpose for the installation of the ECF system and decide whether, considering the dual purposes of the installation, International Paper's primary purpose was pollution control or production.

[¶ 13] Although we give an administrative agency's construction of a statute administered by it great deference,

2. Title 36 M.R.S.A. § 656 (1990) provides in relevant part:
**§ 656.  Real Estate**
The following real estate is exempt from taxation:
. . . .
**E.**  Pollution control facilities.
(1) Water pollution control facilities having a capacity to handle at least 4,000 gallons of waste per day, certified as such by the Commissioner of Environmental Protection, and all parts and accessories thereof.

. . . .
(a) "Facility" means any disposal system or any treatment works, appliance, equipment, machinery, installation or structures installed, acquired or placed in operation primarily for the purpose of reducing, controlling or eliminating water pollution caused by industrial, commercial or domestic waste.
. . . .
36 M.R.S.A. § 656 (1990).

the agency's interpretation is not binding on us. We will not uphold it if the language and purpose of the statute and the agency's practice in a related case contradict it. *See Gulf Island Pond Oxygenation Project Partnership v. Board of Envtl. Protection,* 644 A.2d 1055, 1059 (Me.1994). In addition, even though an agency is not obligated to include a complete factual record with its decision, it must include a written statement of facts sufficient to show a rational basis for the decision. *See* 5 M.R.S.A. § 9061 (1989); 1 M.R.S.A. § 401 (1989); *Murphy v. Board of Envtl. Protection,* 615 A.2d 255, 260 (Me.1992).

[¶ 14] An applicant for tax exemption certification must demonstrate that a facility is "installed, acquired or placed in operation primarily for the purpose of reducing, controlling or eliminating water pollution," 36 M.R.S.A. § 656(1)(E)(1)(a), in order for the facility to qualify as a water pollution control facility exempt from tax pursuant to 36 M.R.S.A. § 655(1)(N) and 656(1)(E)(1). Interpreting this language, we have had to balance two sometimes conflicting principles which underlie sections 655 and 656. By granting tax exemptions for water pollution control facilities, the Legislature intended "to encourage more widespread use of modern waste disposal systems and thus[,] to improve the quality of the [S]tate's water." *Gulf Island Pond,* 644 A.2d at 1059. *See also International Paper Co. v. Board of Envtl. Protection,* 629 A.2d 597, 601 (Me. 1993) (quoting L.D. 72, Statement of Fact (106th Legis.1973)). Exemptions from taxation, however, are not to be broadly construed or extended by application to situations not clearly within the scope of the exemption language. They are entitled to a reasonable interpretation. *See Gulf Island,* 644 A.2d at 1058–59.

[¶ 15] In view of the language and purposes of section 656, we have emphasized the importance of allowing the fact finder to determine, based on the record before it, the purpose for which a facility is primarily installed. *See Ethyl Corp. v. Adams,* 375 A.2d 1065, 1069 (Me.1977) (vacating trial court's judgment and holding that Board did not make an error of law or fact in deciding that a bark-oil burner was neither a water nor an air pollution control facility); [3] *Statler Indust., Inc. v. Board of Envtl. Protection,* 333 A.2d 703 (Me.1975) (vacating entry of summary judgment and remanding to court to determine from conflicting record evidence whether pollution abatement or manufacturing was the primary purpose of the installation).

[¶ 16] We also have recognized that section 656 does not instruct the fact finder about how to determine the reason for which a facility is primarily installed. *See Ethyl,* 375 A.2d at 1075. *See also Statler,* 333 A.2d at 706–07. The Legislature intended the phrase "primarily for the purpose" to be construed in accordance with its common meaning and, thus, we have held that "this phrase connotes a basic, fundamental or principal purpose as opposed to one which is secondary or merely incidental." *Statler,* 333 A.2d at 706. Unless a statute reveals a contrary intent, "the particular words used in the statute must be given their plain, common and ordinary meaning." *Murphy,* 615 A.2d at 258 (citation omitted).

[¶ 17] The language of section 656 recognizes that a facility can serve more than one purpose. For example, a facility may increase efficiency as well as abate pollution. The fact finder, therefore, first must identify the one or several purposes for which the facility was installed, and then find which of these is the primary purpose for which it was installed. New equipment

---

**3.** *Ethyl* involved applications for certification for a sales and use tax exemption pursuant to 36 M.R.S.A. § 1760(29) and (30), in addition to applications for certification for exemption from real estate and property taxes pursuant to 36 M.R.S.A. §§ 655 and 656. The standards and procedure for certification for exemption are the same. Some quotations from *Ethyl,* cited herein, will refer to section 1760.

may have a primary function of production, but that production equipment change may qualify for exemption if the applicant can demonstrate that the primary purpose of its installation was to reduce pollution rather than to improve production.

[¶ 18] Our first case interpreting section 656, *Statler*, like the instant case, involved a dual purpose installation with new equipment replacing existing paper making machinery that also reduced the water and air pollution resulting from the paper making process. *See Statler*, 333 A.2d at 707. *Statler* was decided by summary judgment in the trial court, apparently without an administrative record from the Board. *See id.* at 704. We remanded, determining there were disputes as to material fact that needed to be resolved as to what segments of the several pieces of equipment in dispute were entitled to exemption. *See id.* at 708. Interpreting the exemption statutes we observed that:

> the tax exemption was extended only to those facilities which were "installed, acquired or placed in operation" for the *primary purpose* of attaining pollution abatement. It thus becomes clear that the Legislature did not intend to extend tax exemption to such equipment so purchased or installed unless such was its basic function.

*Id.* at 706.

[¶ 19] The inquiry suggested in *Statler*, requiring consideration of the purpose of an installation, among other issues, follows the plain meaning of the statute and the analytical approach taken in this case. In contrast, *Ethyl* involved a very different fact situation than the dual purpose manufacturing process at issue here and in *Statler*. *Ethyl* involved an application for certification for a water pollution exemption for a bark disposal burner. *See Ethyl*, 375 A.2d at 1066. The application was denied by the Board but approved, on Ethyl's

appeal, by the Superior Court. *See id.* at 1066–67.

[¶ 20] On the Board's appeal, we determined that "the *primary purpose* for which the bark-oil boiler is utilized is to dispose of waste bark." *Id.* at 1076. But we also determined the bark boiler could not be a facility with a primary purpose to reduce or eliminate pollution since bark itself was not pollution. *See id.* at 1077. Pollution was caused by leachate from piles of decaying bark. Future creation of bark piles would be eliminated or reduced by burning the bark, but we determined that "this consequence, however, is entirely incidental to the boiler's *primary* function of bark disposal." *Id.*

[¶ 21] In *Ethyl*, we did not prohibit the fact finder from considering the taxpayer's intended use of equipment as one of several factors relevant to whether the taxpayer installed, acquired, or placed the equipment in operation primarily for the purpose of reducing, controlling, or eliminating water pollution caused by industrial, commercial, or domestic waste. We merely held that the taxpayer's intended use could not control the decision. *See id.* at 1076. We addressed the relevance of the taxpayer's motivation in the following language:

> If § 1760(29)(B) were to be construed to authorize an exemption merely because, in installing a facility, the taxpayer was primarily motivated by an intention to reduce, control, or eliminate "water pollution caused by industrial waste," this would mean that a facility might qualify for the exemption, regardless of whether it performed as intended. We cannot believe that the legislation was designed to make the intention of the taxpayer, as distinguished from the use of the facility, the touchstone of the exemption.[4]

*Id.* at 1076. The "touchstone," as used in *Ethyl*, means the pivotal test or criterion

4. Because the court ultimately determined that the "facility" in question did not abate water pollution, this analysis was actually dic-

ta. *See Ethyl Corp. v. Adams*, 375 A.2d 1065, 1077 (Me.1977).

in an assessment of an object or concept. Our descriptive language in *Ethyl* therefore discloses an intention to make clear what we said implicitly in *Statler:* the taxpayer's intent cannot, by itself, control the determination of the "primary purpose."

[¶ 22] That holding does not, however, render the taxpayer's motivation irrelevant. The Board must weigh a number of factors in determining the primary purpose of the facility. Among those are the actual use to which the equipment will be put, its actual pollution control effect, and the purpose for its installation. As we held in *Ethyl*, if the facility does not actually reduce, control or eliminate water pollution in any significant amount, the fact finder need look no further, regardless of the motivation of the taxpayer in installing the equipment. *See id.* at 1077–78. *See also* 36 M.R.S.A. § 1760(29) (1990). If, however, the equipment does abate water pollution, even if it also performs other tasks, the fact finder must consider the purposes for which it was "installed, acquired or placed in operation." 36 M.R.S.A. § 656(1)(E)(1)(a) (1990).

[¶ 23] *Ethyl* must be distinguished from the present case where the discharge of chlorine, dioxin, furans, and other chemicals are immediately polluting chemical discharges which the ECF process is designed to eliminate. Here, the purpose of the ECF system installation is a factor that must be considered in deciding the exemption.

[¶ 24] In its findings the Board gives no indication that it considered the purposes for which the ECF system was installed. Thus, the Board completed only part of the analysis required by section 656 and by our precedents since *Statler*. Based on the evidence before it, the Board identified the purposes of the ECF system as: (1) bleaching pulp to be used in the paper production process; and (2) controlling pollution by replacing the use of elemental chlorine with the use of chlorine dioxide. However, unlike its determina-

tion in the NOx case, it did not determine the primary purpose for the system's installation. Instead, the Board appears to have concluded that because the ECF system aids production, it could not have been installed primarily for the purpose of pollution control.

[¶ 25] The Board's failure to determine the primary purpose for the installation of the ECF system leaves unresolved a critical finding that section 656 requires it to make. Consequently, we vacate the Superior Court's judgment with respect to the ECF system and order that the issue be remanded to the Board for further findings to determine the primary purpose for the installation of the ECF system.

[¶ 26] International Paper also challenges the Board's determination that the ECF system is not a water pollution control facility that has "a capacity to handle at least 4,000 gallons of waste per day." 36 M.R.S.A. § 656(1)(E)(1). The Board found that: (1) the ECF system contributes to the production of approximately eight million gallons of wastewater per day; and (2) does not handle waste either individually or as part of a system. The Board appears to have concluded that the ECF system cannot satisfy the 4,000 gallon per day requirement because it contributes to the production process that generates waste.

[¶ 27] We disagree with the Board's narrow construction of the 4,000 gallon per day standard. Neither the language of 36 M.R.S.A. § 656(1)(E) nor the purposes of the section, *see Gulf Island*, 644 A.2d at 1059; *International Paper*, 629 A.2d at 601, supports the Board's interpretation that water pollution control facilities serving a production function cannot "handle" waste. We have not interpreted section 656 to preclude facilities involved in the production process from being capable of meeting the 4,000 gallon per day requirement. *See, e.g., Gulf Island*, 644 A.2d at 1059–60 (holding that waste is not required

to be treated prior to discharge); *International Paper*, 629 A.2d at 600–01 (holding that water pollution included pollutants that are not waterborne). Moreover, just as the statute does not distinguish between facilities that treat or reduce waste prior to its discharge into the water and those that treat or reduce waste subsequent to its discharge, *see Gulf Island*, 644 A.2d at 1059–60, it does not distinguish between those facilities that treat or reduce waste after the completion of the production process and those that treat or reduce waste during the production process.

[¶ 28] Here, the Board found both that the ECF system: (1) controls pollution by eliminating or reducing the presence of elemental chlorine in the mill; and (2) contributes to the production of eight million gallons of wastewater per day. These findings establish that every day the ECF system effects millions of gallons of water containing waste and therefore satisfies the 4,000 gallons of waste requirement. The Board's decision to the contrary cannot be upheld because it is based on an erroneous interpretation of section 656.

### III. LOW NITROGEN OXIDE BURNER SYSTEM

[¶ 29] The Town contends that substantial evidence on the record does not support the Board's decision that the low NOx burner system is a tax exempt air pollution control facility pursuant to subsections 655(1)(N) and 656(1)(E)(2).[5] This Court does not substitute its judgment for that of an agency and must affirm findings of fact if they are supported by substantial evidence in the record. *See*

*Gulf Island*, 644 A.2d at 1059; *Aviation Oil Co. v. Department of Envtl. Protection*, 584 A.2d 611, 614 (Me.1990). We examine the entire record to determine whether, on the basis of all the testimony and exhibits before it, the agency could fairly and reasonably find the facts as it did. *See Imagineering, Inc. v. Superintendent of Ins.*, 593 A.2d 1050, 1053 (Me.1991).

[¶ 30] A facility must be "installed, acquired or placed in operation primarily for the purpose of reducing, controlling, eliminating or disposing of industrial air pollutants," to qualify as an air pollution control facility. 36 M.R.S.A. § 656(1)(E)(2) (1990). We have construed this language as we have construed the language in section 656(1)(E)(1) governing water pollution control facilities. *See Ethyl*, 375 A.2d at 1078. Thus, it is the Board's responsibility to determine, based on the record before it, the purpose for which a facility is primarily installed.

[¶ 31] Here, the Board identified two purposes of the low NOx burner system: (1) assisting with fuel and air delivery to the power boilers; and (2) reducing air pollution by reducing the creation of nitrogen oxide. Based on its findings that the system's delivery function is small and its pollution control function is significant, the Board concluded that the system was installed primarily for the purpose of reducing nitrogen oxide levels.

[¶ 32] The record supports the Board's decision. The evidence shows the low NOx burners serve both of the functions the Board identified. The Town does not dispute that nitrogen oxide is a pollutant. The record also shows that the parts

---

5. Title 36 M.R.S.A. § 656 (1990) provides in relevant part:

   **§ 656. Real Estate**

   The following real estate is exempt from taxation:

   . . . .

   E. Pollution control facilities.

   (2) Air pollution control facilities, certified as such by the Commissioner of Environmental Protection, and all parts and accessories thereof.

   . . . .

   (a) "Facility" means any appliance, equipment, machinery, installation or structures installed, acquired or placed in operation primarily for the purpose of reducing, controlling, eliminating or disposing of industrial air pollutants.

   36 M.R.S.A. § 656 (1990).

comprising the low NOx burners constitute only a small part of the fuel delivery system that is merely one part of the larger system comprising the power boilers.

[¶ 33] The record, therefore, indicates that the low NOx burner system serves only a limited function in delivering fuel and air to the power boilers and an extensive function in reducing nitrogen oxide. Consequently, in examining the record before it, the Board did not err in concluding that the low NOx burner system was equipment installed "primarily for the purpose" of reducing air pollution and in certifying the system as an air pollution control facility qualifying for tax exemption pursuant to 36 M.R.S.A. §§ 655(1)(N) and 656(1)(E)(2).

The entry is:

Judgment vacated and remanded to the Superior Court for remand to the Board of Environmental Protection for consideration consistent with this opinion with regard to the ECF system; judgment affirmed with regard to the low NOx burner system.

