2008 ME 115

**RANGELEY CROSSROADS COALITION et al.**

v.

**LAND USE REGULATION COMMISSION et al.**

Supreme Judicial Court of Maine.

Argued: Jan. 16, 2008.
Decided: July 15, 2008.

---

ray, Portland, ME, for Rangeley Crossroads Coalition, Inc.

Catherine R. Connors, Esq. (orally), Philip F.W. Ahrens, Esq., Joanna B. Tourangeau, Esq., Pierce Atwood, LLP, Portland, ME, for Nestlé Waters North America, Inc.

G. Steven Rowe, Attorney General, Amy B. Mills, Asst. Atty. Gen. (orally), Augusta, ME, for Maine Land Use Regulation Commission.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

Majority: CLIFFORD, ALEXANDER, SILVER, MEAD, and GORMAN, JJ.

Dissenting: SAUFLEY, C.J. and LEVY, J.

SILVER, J.

[¶ 1] Rangeley Crossroads Coalition (Coalition) appeals, pursuant to 12 M.R.S. § 689 (2007) and M.R. Civ. P. 80C, from a judgment of the Superior Court (Franklin County, *Jabar, J.*) affirming a decision of the Land Use Regulation Commission (LURC) to authorize Nestle Waters North America, Inc.'s (Nestle) proposed water extraction facility in Dallas Plantation, Franklin County. The Coalition argues that (1) LURC's decision was arbitrary, capricious, legally erroneous, and unsupported by competent evidence in the record, and (2) the category of permitted use under which Nestle's application was approved is unconstitutional on its face and as applied, we affirm the judgment.

## I. CASE HISTORY

[¶ 2] In early 2005 Nestle secured an option to purchase approximately 1000 acres off Redington Road in Dallas Plantation. The site is within LURC's jurisdic-

John C. Bannon, Esq. (orally), Sarah A. McDaniel, Esq., Murray, Plumb & Mur-

tion and is subject to the LURC's Land Use Districts and Standards for areas within its jurisdiction. *See* 4 C.M.R. 04 061 010–1 to –174 ch. 10 (2006–2007) (LURC Rules). Under the LURC Rules, the site is primarily located within a general management subdistrict (M–GN). *See* 4 C.M.R. 04 061–51 to –53 § 10.22 (2006). Under the site is an aquifer that feeds the Dead River and that is the source for the drinking water that the Rangeley Water District (RWD) provides to the Town of Rangeley and nearby townships and plantations. Access to the site is either via Route 16, which passes from Stratton and Kingfield on the north, or through the center of downtown Rangeley to the south.

[¶ 3] On July 19, 2005, Nestle submitted to LURC an application for a development to permit Nestle to construct a commercial groundwater extraction and truck load-out facility on the site. This facility would be visited by a number of tanker trucks, which would load up with water and then would transport the water south on Route 16, through downtown Rangeley, to Nestle's bottling plants in Hollis, Poland Spring, and Kingfield. Nestle applied for permission to construct the facility under the regulations governing the M–GN subdistrict.

[¶ 4] The spring source on the site is approximately three miles off Route 16, along the private gravel Redington Road. This spring has its origin in the aquifer mentioned above, and prior to LURC's decision, Nestle reached agreement with RWD regarding use of that aquifer.

[¶ 5] After Nestle submitted its application, LURC granted intervener status to RWD, the Town of Rangeley, and the Dallas Plantation Assessors. In November 2005, a public hearing was scheduled concerning the application. On the eve of the hearing, Nestle and RWD entered into an agreement to resolve RWD's concerns and to secure its support for Nestle's application. The Assessors continued to oppose the proposed facility.

[¶ 6] During the public hearing, the Assessors and the Coalition spoke against the facility. After the hearing, LURC accepted written comments. The LURC staff then issued a decision recommending that LURC approve Nestle's application.

[¶ 7] LURC again solicited written comments concerning the items discussed in the staff's recommended decision. At its deliberations meeting on March 13, 2006, the LURC commissioners heard a presentation by LURC staff and accepted testimony from Nestle, RWD, the Town of Rangeley, and the Coalition. Other agencies reviewed Nestle's application, including the Maine Department of Environmental Protection, the Maine Department of Human Services Drinking Water Program, the Maine Department of Transportation, the Maine Department of Inland Fisheries and Wildlife, the Maine Geologic Survey, the Maine State Soil Scientist, and the Maine Natural Areas Program. The agencies had an overall positive opinion of Nestle's project, and were concerned only about the adequacy of water level monitoring. LURC voted five-to-one to grant Nestle a development permit for the facility and required a more stringent monitoring regime in response to agency concerns. LURC found that Nestle's project satisfied Categories 6 and 29 in combination, and also Category 30, of its regulations.

[¶ 8] Part of the agreement between Nestle and RWD stipulated that Nestle's water withdrawal will not cause an unreasonable adverse effect on RWD's wells. It was also stipulated that Nestle will negotiate a set of festival days with the Town of Rangeley when Nestle's trucks will not be routed through the town. The agreement also provided that Nestle will not route more than two trucks per hour through

the town between 9:00 A.M. and 5:30 P.M. The permit also required Nestle to form and report on the activities of a Traffic Management Committee, which is to include representatives from the Town of Rangeley and Dallas Plantation, in order to monitor traffic connected to the facility and ensure that it does not cause undue adverse effects. In its approval of Nestle's application, LURC noted that traffic through downtown Rangeley will increase no more than 1.4% and the level of service will remain the same, so increased congestion is not indicated.

[¶ 9] On appeal to the Superior Court, the court vacated LURC's finding that the proposed facility was an allowable use pursuant to Categories 6 and 29 of its rules, but the court upheld LURC's determination that the use was permitted under Category 30. *See* 4 C.M.R. 04 061 010–52 to –53 § 10.22(A)(3)(c)(6), (29), (30) (2006).

## II. DISCUSSION

[¶ 10] When the Superior Court acts in an intermediate appellate capacity pursuant to M.R. Civ. P. 80C, we review the administrative agency's decision directly for an abuse of discretion, error of law, or findings not supported by the evidence. *Tremblay v. Land Use Regulation Comm'n*, 2005 ME 110, ¶ 13, 883 A.2d 901, 904; *Downeast Energy Corp. v. Fund Ins. Review Bd.*, 2000 ME 151, ¶ 13, 756 A.2d 948, 951. Whether a proposed use falls within a given category contained in a zoning ordinance is a question of law. *C.N. Brown Co. v. Town of Kennebunk*, 644 A.2d 1050, 1051 (Me.1994). We give great deference to an administrative agency's construction of a statute administered by it. *Gulf Island Pond Oxygenation Project P'ship v. Bd. of Envtl. Prot.*, 644 A.2d 1055, 1059 (Me.1994). We therefore do not substitute our own judgment for that of the agency and must affirm find-

ings of fact if they are supported by substantial evidence in the record. *Int'l Paper Co. v. Bd. of Envtl. Prot.*, 1999 ME 135, ¶ 29, 737 A.2d 1047, 1054. We examine the entire record to determine whether the agency could fairly and reasonably find the facts as it did. *Id.* We will also not set aside an agency's interpretation of its own internal rules, regulations, or procedures unless the rules or regulations plainly compel a contrary result. *Downeast Energy Corp.*, 2000 ME 151, ¶ 13, 756 A.2d at 951. Thus, an agency's interpretation will not be upheld if it is contradicted by the language and purpose of the statute. *Gulf Island*, 644 A.2d at 1059. We avoid expressing opinions on constitutional law whenever a non-constitutional resolution of the issues renders a constitutional ruling unnecessary. *Your Home, Inc. v. City of Portland*, 432 A.2d 1250, 1257 (Me.1981).

[¶ 11] Because we find that Nestle's proposed use is permitted under Category 30 of the uses permitted in the M–GN subdistrict by the LURC Rules, we do not consider whether it would be permitted under Categories 6 and 29. The Coalition argues that Category 30 is unconstitutional on its face because it provides no intelligent guidance as to permissible uses and provides no meaningful constraints on LURC's discretion. The Coalition also argues that Category 30 is unconstitutional as applied in this case because LURC used it to permit Nestle's proposed use, which is inconsistent with the forestry and agricultural uses protected by Category 30. We consider the Coalition's argument that Category 30 is facially unconstitutional first.

[¶ 12] We have held that statutes are void for vagueness when they fail "to furnish a guide which will enable those to whom the law is to be applied to reasonably determine their rights thereunder, and [which will assure] that the determina-

tion of those rights will not be left to the purely arbitrary discretion of the administrat[ive agency]." *Lentine v. Town of St. George,* 599 A.2d 76, 78 (Me.1991) (quotation marks omitted) (alterations in original). Under this test, Category 30 is not void for vagueness.

[¶ 13] Category 30 permits, in the M–GN subdistrict, "[o]ther structures, uses, or services which the Commission determines are consistent with the purposes of this subdistrict and of the Comprehensive Land Use Plan and are not detrimental to the resources or uses they protect." 4 C.M.R. 04 061 010–53 § 10.22(A)(3)(c)(30) (2006).

[¶ 14] The rules thus require three things for a use to fit within Category 30:(1) LURC must determine that the use is consistent with the purposes of an M–GN subdistrict; (2) LURC must determine that the use is consistent with the Comprehensive Land Use Plan (CLUP); and (3) LURC must determine that the use is not detrimental to the resources or uses that the M–GN subdistrict and the CLUP protect. All of these criteria provide limits to LURC and guidance to others as to which uses are permitted and which are not.

[¶ 15] First, the LURC Rules state that the purpose of the M–GN subdistrict is "to permit forestry and agricultural management activities to occur with minimal interferences from unrelated development in areas where the Commission finds that the resource protection afforded by protection subdistricts is not required." 4 C.M.R. 04 061 010–51 § 10.22(A)(1) (2006). Therefore, uses that are unrelated to for-

estry or management activities will be allowed only if they minimally interfere with such activities and if they do not result in a need for resource protection.

[¶ 16] Second, Category 30 explicitly requires that any use be consistent with the CLUP. The CLUP extensively describes the goals, policies, and uses to be pursued in LURC's jurisdiction. This description evinces a desire to develop the jurisdiction economically while at the same time preserving its environment. LURC is clearly limited by this description, and others will be guided by it.

[¶ 17] Third, LURC can approve only uses that are not detrimental to the resources that the M–GN subdistrict and the CLUP protect.[1] This certainly limits LURC in the uses it can permit and provides guidance to others.

[¶ 18] Because Category 30 provides three criteria that uses must meet and because each of these three criteria meaningfully limits LURC's ability to approve uses and provides guidance to others as to permitted and prohibited uses, we conclude that Category 30 is constitutional on its face and is not void for vagueness.

[¶ 19] The Coalition also argues that Category 30 is unconstitutionally vague as applied in this case because to declare that Nestle's proposed use is consistent with Category 30 means that "consistency" loses all meaning. Assuming, *arguendo,* that there is a constitutional question as to whether Category 30 is vague as applied, we do not reach it because, as we note above, Category 30 provides three criteria that uses must meet, and each of these

---

**1.** Because the CLUP is meant to balance economic development with environmental protection, we do not think this means that any use that causes even slight environmental degradation to occur is to be prohibited. If that were the case, no buildings could be built in the M–GN subdistrict. Because this issue involves a proposed use that, the record shows, will have no appreciable negative environmental impact, we refrain from making a general ruling on the correct balance between economic development and environmental protection.

criteria meaningfully limited LURC's ability to approve the use proposed in this case. We now consider whether Nestle's proposed use is consistent with Category 30.

[¶ 20] First, Nestle's proposed use is consistent with the purposes of the M–GN subdistrict, described above. Nestle has presented evidence from experts that its proposed use will occupy one acre of land, preserve 999 acres as forest, and extract an amount of water that will not appreciably affect the source aquifer or surrounding surface waters. The Coalition did not present substantial evidence contrary to this position. This impact would likely amount to minimal or no interference to forestry and agricultural management activities in the region. Because there is no convincing evidence that the proposed use will threaten natural resources, the second part of the M–GN purpose statement is also satisfied.

[¶ 21] Second, the CLUP speaks in a number of places to proposed uses such as Nestle's. It notes that LURC is charged with preventing "the despoliation, pollution and inappropriate use of the water." Me. Dep't of Conservation, Land Use Regulation Commission, Comprehensive Land Use Plan 79 (1997 rev.). The CLUP notes elsewhere that one apparently appropriate use of groundwater is for a "water bottling operation." *Id.* at 82. The CLUP later notes that the goal for LURC's jurisdiction over "water resources" is to "[p]reserve, protect and enhance the quality and quantity of surface and ground waters." *Id.* at 138. Its policy is to "[r]egulate uses of land and water . . . in order to prevent degradation of water quality and undue harm to natural habitats." *Id.* Moreover, it seeks to "[r]equire . . . development standards [to] be met to protect water quality [and] water quantity. . . ." *Id.* at 138–39.

[¶ 22] CLUP's goals for the water in LURC's jurisdiction are, in short, sustaining or improving the quality and quantity of water. Nestle has demonstrated that its proposed use will not negatively affect the quality or quantity of any water. The Coalition has not submitted substantial evidence to the contrary. These CLUP provisions alone would be adequate for LURC to approve Nestle's proposed use. There is more, however.

[¶ 23] CLUP's goal for development is to "protect and conserve forest, recreational, plant or animal habitat and other natural resources, to ensure the compatibility of land uses with one another and to allow for a reasonable range of development opportunities important to the people of Maine." *Id.* at 140. CLUP's goal for economic development is to balance "maintenance and creation of quality jobs, with protecting the environmental quality and special values of this area." *Id.* at 141. The record presented to LURC demonstrated that the environmental impact of Nestle's proposed use is negligible, while its impact on the creation of jobs would be positive, demonstrating a good fit with CLUP's goals for reasonable development, quality jobs, and natural resource protection. Such a use would fit the M–GN subdistrict well, because that subdistrict, "as presently structured, assumes that many activities can co-exist without adversely affecting each other or the forest resource." *Id.* at 49.

[¶ 24] Third, LURC must determine that the proposed use is not detrimental to the resources or uses that the M–GN subdistrict and the CLUP protect. This is the crux of the issue, and the record suggests that LURC could have found that Nestle's proposed use would not be detrimental.

[¶ 25] For the above reasons, we conclude that Nestle's proposed use is consistent with the requirements of Category 30. LURC did not abuse its discretion, err as a matter of law, or make findings not supported by the evidence.

The entry is:

Judgment affirmed based on finding regarding Category 30.

SAUFLEY, C.J., with whom LEVY, J., joins, dissenting.

[¶ 26] I must respectfully dissent.

[¶ 27] Rezoning, with its inherent public airing and thorough review of the newly proposed uses, should be undertaken before Nestle is allowed to engage in the extraction and transportation of the Rangeley Lakes Region's valuable water resources.

[¶ 28] Nestle proposes to withdraw millions of gallons of water from an aquifer in the region. Each day, up to one hundred trucks would transport 8,250 gallons each of water from the area. Nothing in the Land Use Regulation Commission's existing Comprehensive Land Use Plan or in its Prospective Zoning Plan for the Rangeley Lakes Region explicitly contemplates, addresses, or permits such an extraction of the valuable water resource from the Rangeley Lakes Region. It is evident that this use was not anticipated by the Commission. Acknowledging the possibility that certain uses might not have been predicted, the Land Use Regulation Commission's Prospective Zoning Plan for the Rangeley Lakes Region provides that LURC "will rezone areas if a landowner can demonstrate that the Commission did not foresee the amount, type, or character of development needed in the area." Me. Land Use Regulation Commission, Prospective Zoning Plan for the Rangeley Lakes Region 31 (2001).

[¶ 29] Thus, although I agree that we give great deference to an agency's interpretation of its own regulations, *see Wheaton v. Dep't of Health & Human Servs.*, 2008 ME 48, ¶ 5, 943 A.2d 568, 570, I would conclude that, absent a properly executed, publicly vetted, change in zoning that alters the nature of the zone in which the proposed use is located, this type of enterprise is not permitted.

[¶ 30] More particularly, I cannot agree with the Court's opinion that the application was properly approved under category 30 of the uses allowed with a permit in the general management subdistrict (M–GN) because I would conclude that extracting and trucking millions of gallons of water per year is not "consistent with the purposes of this subdistrict and of the Comprehensive Land Use Plan." 4 C.M.R. 04 061 010–53 § 10.22(A)(3)(c)(30) (2006). I would further conclude that this ongoing, substantial extraction and transportation of water does not fall within any of the uses permitted in a general management subdistrict pursuant to LURC's Land Use Districts and Standards. Accordingly, I would vacate the Superior Court's judgment and remand for the court to vacate LURC's approval of Nestle's application.

## I. THE RANGELEY LAKES REGION

[¶ 31] The version of the Comprehensive Land Use Plan in effect at the time of the appeal identified the Rangeley Lakes Region as an area of rapid growth requiring special planning. Me. Dep't of Conservation, Land Use Regulation Commission, Comprehensive Land Use Plan 110 (1997 rev.). The growth in the region was attributed to residential and recreational development. *Id.* Because of the unique characteristics of the Rangeley Lakes Region, LURC amended the Comprehensive Plan, effective January 1, 2001, by adopt-

ing the Prospective Zoning Plan for the Rangeley Lakes Region. The Rangeley Plan focused on preserving the region's natural resources for four-season recreation, forestry, and year-round development in a diversity of rural and developed settings. Me. Land Use Regulation Commission, Prospective Zoning Plan for the Rangeley Lakes Region i, 4 (2001). LURC acknowledged that, outside the Town of Rangeley, "[c]ommercial enterprises [we]re not extensive," and identified as examples of commercial activities a ski area, a restaurant, a golf course, sporting camps, and cabin facilities. *Id.* at 8.

[¶ 32] The Rangeley Plan adopted certain new zones but did not make changes to the management zone in which the Nestle site is located. *Id.* at 19. Most critical to our analysis today, the plan explicitly acknowledged the possibility that uses might emerge that were not anticipated and provided that LURC could rezone areas in such circumstances. *Id.* at 14, 31. The general management subdistrict from which Nestle proposes to extract and transport millions of gallons of water has not been explicitly zoned for these activities, nor did Nestle seek rezoning.

[¶ 33] In examining the Comprehensive Land Use Plan and the Rangeley Plan, it is evident that neither of them explicitly approved or anticipated water extraction and transportation as a permitted use in the Rangeley Lakes Region despite the updating of the Comprehensive Land Use Plan in 1997, the enactment of the Rangeley Plan in 2000, and the existence of substantial commercial water extraction activities in other areas in the state for many years.

[¶ 34] With this background in mind, I turn to the more specific question of whether, in the absence of rezoning, it is reasonable to interpret LURC's Land Use Districts and Standards governing the general management subdistrict to allow the proposed resource extraction. *See* 4 C.M.R. 04 061 010–1 to –174 ch. 10 (2006–2007).

## II. THE GENERAL MANAGEMENT SUBDISTRICT

[¶ 35] LURC created the general management subdistrict "to permit forestry and agricultural management activities to occur with minimal interferences from unrelated development in areas where the Commission finds that the resource protection afforded by protection subdistricts is not required." 4 C.M.R. 04 061 010–51 § 10.22(A)(1) (2006). The regulations list thirty uses that a party may engage in with a permit from LURC. 4 C.M.R. 04 061 010–52 to –53 § 10.22(A)(3)(c) (2006). The regulations have never explicitly identified the substantial extraction and shipping of water for commercial purposes as an anticipated use.

[¶ 36] Relevant to the present appeal are the following categories of permitted uses:

(6) Filling and grading, which is not in conformance with the standards of Section 10.27, F and draining, dredging, and alteration of the water table or water level for other than mineral extraction;

. . . .

(29) Other structures, uses, or services that are essential to the uses listed in Section 10.22, A, 3, a through c; and

(30) Other structures, uses, or services which the Commission determines are consistent with the purposes of this subdistrict and of the Comprehensive Land Use Plan and are not detrimental to the resources or uses they protect.

4 C.M.R. 04 061 010–52 to –53 § 10.22(A)(3)(c) (2006). The question is whether any of these categories may be

interpreted so broadly as to encompass the Nestle proposal.

A. Categories 6 and 29

[¶ 37] LURC's regulations, the Land Use Districts and Standards, contain a provision governing the general management subdistrict that allows, upon obtaining a permit, the "draining, dredging, and alteration of the water table or water level for other than mineral extraction," 4 C.M.R. 04 061 010–52 § 10.22(A)(3)(c)(6) (2006), and any use that is essential to that enterprise, 4 C.M.R. 04 061 010–53 § 10.22(A)(3)(c)(29) (2006). These categories of permitted uses cannot be read to permit the sort of intense water harvesting that Nestle proposes. Extracting 184 million gallons of spring water per year cannot be regarded as a mere "draining" or "alteration of the water table or water level." *See* 4 C.M.R. 04 061 010–52 § 10.22(A)(3)(c)(6) (2006). Drainage or alteration of the water table or water level are uses associated with preparing land for construction and for development on the land; they are not uses that relate to the commercial bottling of water from an aquifer. Accordingly, I would conclude, as did the Superior Court, that Nestle's proposed use does not fall under either category 6 or the ancillary provision contained in category 29.

B. Category 30

[¶ 38] The LURC regulations permit "[o]ther … uses … which the Commission determines are consistent with the purposes of this subdistrict and of the Comprehensive Land Use Plan and are not detrimental to the resources or uses they protect." 4 C.M.R. 04 061 010–53 § 10.22(A)(3)(c)(30) (2006). I would conclude that the Nestle plan fails to meet the requirements of consistency with the purposes of the subdistrict and consistency with the Comprehensive Plan.

1. Consistency with the Purposes of the Subdistrict

[¶ 39] The explicitly identified purpose of the M–GN subdistrict "is to permit forestry and agricultural management activities to occur with minimal interferences from unrelated development in areas where the Commission finds that the resource protection afforded by protection subdistricts is not required." 4 C.M.R. 04 061 010–51 § 10.22(A)(1) (2006). The extraction of millions of gallons of water from an aquifer for commercial water sales cannot reasonably be characterized as forestry or agricultural management. Further, it is not the sort of use identified in the regulations as producing only a minimal interference with forestry and agricultural management. The uses identified in the M–GN regulations include various recreational uses such as fishing, hiking, hunting, and camping; forest management; wildlife and fishery management; agricultural management; filling and grading; driveways associated with residences; parking areas; construction of storage structures for road maintenance, agricultural, and forestry equipment; sporting camps; campgrounds; family burying grounds; certain mineral exploration and extraction activities; maple sugar processing operations; sawmills and chipping mills; solid waste disposal facilities; and utility facilities, including service drops. 4 C.M.R. 04 061 010–51 to –53 § 10.22(A)(3)(a)-(c) (2006).

[¶ 40] Examining these uses, it is evident that the substantial water extraction proposed by Nestle was not contemplated as a use permitted in the M–GN subdistrict. The approved uses are either directly related to recreation, agriculture, or forestry, or they are approved to support those uses. Drawing millions of gallons of water per year from an aquifer in the

Rangeley Lakes Region for commercial sale serves none of these central general management subdistrict goals. Rather than deeming the use consistent by drawing a vague analogy to agricultural and forestry uses, I would conclude that the proposed use is not consistent with the purposes of the general management subdistrict and that rezoning would be necessary to allow the proposed use.

### 2. Consistency with the Purposes of the Comprehensive Land Use Plan

[¶ 41] In addition to its inconsistency with the subdistrict, the proposed use is inconsistent with the Comprehensive Land Use Plan in effect at the time of the proceedings. The Comprehensive Plan identified the general management subdistrict as "[c]over[ing] the residual of LURC jurisdiction, where forest and agricultural activities are allowed and encouraged without significant restriction." Me. Dep't of Conservation, Land Use Regulation Commission, Comprehensive Land Use Plan 6 (1997 rev.). The Comprehensive Plan also particularly identified the Rangeley Lakes Region as an area where haphazard growth could degrade the attractiveness of the region as a recreational center and damage the tourist-based economy. *Id.* at 119. Regarding water resources, the Comprehensive Plan announced a general goal to "[p]reserve, protect and enhance the quality and quantity of surface and ground waters." *Id.* at 138. The policies adopted in pursuit of that goal focused on preventing harm to natural habitats and recreational or aesthetic values, preventing construction in flood prone areas, and protecting bodies of water and ground water from pollution or other threats. *Id.* at 138–39. Nothing in the Comprehensive Plan demonstrated that LURC had anticipated the harvesting of millions of gallons of water for commercial sale as a potential use, least of all in the specially treated Rangeley Lakes Region.

[¶ 42] Most compellingly, an examination of the Rangeley Plan, adopted as an amendment to the Comprehensive Plan, demonstrates that this unanticipated proposed use in the general management subdistrict should not be permitted. The Rangeley Plan emphasized the importance of *prospective* planning. Me. Land Use Regulation Commission, Prospective Zoning Plan for the Rangeley Lakes Region 14 (2001). Accordingly, LURC adopted prospective planning principles that demanded adherence to the Comprehensive Plan and the Rangeley Plan itself:

This prospective plan is guided by the following principles:

1. **CONSISTENCY WITH CLUP.** Be consistent with the vision, goals, and policies of the Commission's Comprehensive Land Use Plan;

. . . .

6. **STICK TO THE PLAN.** Make it more difficult to rezone areas outside of designated development zones unless extenuating circumstances, such as unforeseen public needs, emerge. Otherwise, this plan, and the effort that went into it will not be an effective investment.

*Id.* The Rangeley Plan also relies on the zoning process, rather than the vague shoe-horning of activities into ill-fitting categories. Pursuant to the plan, "[t]he Commission will *rezone* areas if a landowner can demonstrate that the Commission did not foresee the amount, type, or character of development needed in the area." *Id.* at 31 (emphasis added).

[¶ 43] As these portions of the Rangeley Plan demonstrate, LURC's prospective plan for the Region did not contemplate the "amount, type, or character" of Nestle's proposed use of land in the general

management district for substantial water harvesting. *Id.* Wisely acknowledging the possibility of unexpected circumstances, however, LURC expressly stated that rezoning—not granting permits by loose analogy to other approved uses—was the solution for an applicant when the Plan failed to contemplate the proposed use. I read the Rangeley Plan to require an application for a zone change—not a mere application for a permit—for Nestle to be able to use the land for its proposed intensive commercial use.

## III. CONCLUSION

[¶ 44] In my opinion, neither the Land Use Districts and Standards, the Comprehensive Plan, nor the Rangeley Plan currently permit Nestle to extract and transport millions of gallons of the Rangeley Lakes Region's water resources each year. I would vacate the Superior Court's judgment and remand the matter to the court for it to vacate the permit.