STATE OF MAINE                                          SUPERIOR COURT
CUMBERLAND, ss.                                         CIVIL ACTION
                                                        Docket No. AP-12-26
                                                        RAC-CUM- 12/20/2012

STATE OF MAINE
Cumberland,ss,Clerk's Office

DEC 20 2012

RECEIVED

ALATHEA BUSHNELL,
        Petitioner

                                                        ORDER ON 80C APPEAL

        v.

MARY MAYHEW,
Commissioner, DHHS,
        Respondent


        Pursuant to Maine Rule of Civil Procedure 80C, Petitioner Alathea Bushnell and

her mother seek review of a March 15, 2012 decision of the Department of Health and

Human Services, which denied Alathea certain MaineCare nursing benefits.

BACKGROUND

        Alathea Bushnell is a fourteen-year-old female who has been receiving in home

nursing services through MaineCare. Prior to the decision in question, she had been

receiving private duty nursing (PDN), Level IV benefits, including 28 hours per week of

LPN (licensed practical nurse) coverage. She has a number of diagnoses, including

genetic disease, gastrostomy tube site hernia, autistic disorder, and medically intractable

seizure disorder.

        On September 26, 2011, Maxim Health Care, an authorized agent for the

Department of Health and Human Services (the Department), completed a Medical

Eligibility Determination – Kids PDN Assessment for Alathea. The Assessment found

that Alathea requires extensive assistance in activities of daily living (ADLs), including

1

dressing. eating. and toilet use, and has total dependence in personal hygiene and bathing. It indicated that Alathea has "uncontrolled seizure disorder," and requires the services of a registered professional nurse in the home to administer food and medication through her g-tube and to observe, assess, and manage her seizure disorder.

Based on the Assessment and on Alathea's behalf, Maxim requested prior authorization[1] for 16 RN (registered nurse) hours and 20 LPN (licensed practical nurse) hours per week for the period of October 5, 2011, through April 5, 2012. On October 13, 2011, the Department issued a "Partial Approval" of the services requested. The Department denied all RN services. It approved 5 LPN hours per week, and approved 22.5 CNA[2] (certified nursing assistant) hours per week. The Department denied the remaining services based on its finding that Alathea did not have an "unstable medical condition" as defined by the MaineCare rules.[3]

Alathea filed a timely administrative appeal of the Department's decision to deny the full LPN hours requested. The appeal did not challenge the Department's denial of RN hours. An administrative hearing took place on December 19, 2011, in front of hearing officer Tamra Longanecker. The hearing officer found the following facts, in addition to those contained in the Assessment. On a daily basis, Alathea can have

---

[1] According to the MaineCare Benefits Manual (MCBM), or MaineCare Rules, a person must obtain "prior authorization" or "prior approval" from an assessing agency before obtaining coverage for private duty nursing services. 10-144 C.M.R. ch. 101, ch. II, § 96.03.

[2] A certified nursing assistant is primarily concerned with providing "personal care services," which include Activities of Daily Living (ADLs) and some medication administration. 10-144 C.M.R. ch. 101, ch. II, § 96.01-4.

[3] An "unstable medical condition" exists when a member's condition is "fluctuating in an irregular way and/or is deteriorating and affects the Member's ability to function independently." 10-144 C.M.R. ch. 101, ch. II, § 96.01-21.

2

anywhere from 0-150 seizures, and there is a wide variance in the frequency and type of seizure activity. Alathea has experienced seizures since she was five. The most serious seizures she has experienced were "grand mal" seizures, which she was having on a daily basis at the time of the hearing. During grand mal seizures, Alathea has injured herself, her face has turned blue, and she has foamed at the mouth. She cannot communicate during the seizures. Alathea must wear a helmet at all times.

Alathea has a vagal nerve stimulator implanted in her chest. During a seizure, someone can swipe a magnet over her chest, which causes the device to stimulate the vagus nerve at various strengths and frequencies in order to interrupt the seizure. Alathea has also been prescribed six different anti-seizure medications. One of these is Diastat , which is a strong drug to be administered rectally during seizures lasting longer than five minutes or involving respiratory compromise. At the time of hearing, Alathea had required the use of Diastat on three occasions.

The hearing officer also considered two doctors' opinions. First, Dr. Takeoka of the Epilepsy Program at Children's Hospital noted in an October 24, 2011 letter that Alathea continues to have "daily generalized convulsive seizures," despite extensive treatment. Dr. Takeoka noted Alathea's dependence on the vagal nerve stimulator and Diastat for severe seizures, and stated: "I strongly recommend Alathea to be taken care at home by personnel who are able to administer such emergent interventions." Second, in notes from October 18, 2011, Dr. Dalzell wrote: "I agree given that Alathea's seizure condition continues to be unstable it is critical for all caregivers and in home support to have the training required to administer Diastat if needed."

3

The findings indicate that to the extent Alathea is at public school, the school's registered full-time nurse is located only a few doors down from her classroom and is consulted on a daily basis regarding Alathea's health care.

The parties agreed at the hearing that a CNA is not trained to administer medications or assess Alathea's medical condition. The Department suggested that if a CNA noticed that Alathea was in distress, then that person could immediately call 911. The Department maintained that Alathea's condition was "chronic" but did not constitute an "unstable medical condition" under MaineCare rules of eligibility.

On February 9, 2012, the hearing officer issued a Recommended Decision. Based on her findings, the hearing officer recommended that the Commissioner find that the Department erred when it denied all but 5 hours of LPN services in Alathea's home. In doing so, she cited substantial deference to Alathea's medical providers, and rejected the Department's plan of relying on emergency medical treatment when Alathea experienced serious seizures.

On March 15, 2012, Commissioner Mary Mayhew issued the Department's Final Decision. The Commissioner adopted the recommended findings of fact, but rejected the recommended decision. Instead, the Commissioner concluded that the facts did not support a finding that Alathea had an "unstable medical condition," because:

> An unstable medical condition is evidenced by frequent changes in treatment or medication. There is no evidence in this case of frequent communications with Alathea's treating physician, a change in her medical treatment or change in her medication. There was evidence that Alathea's seizure disorder is such that she requires supervision by someone who is knowledgeable of her plan of care. But, given the infrequent use of Diastat (or other medical intervention) when she is having a seizure, there was insufficient evidence that this supervision currently needs to be by a medical professional.

4

Thus, the Commissioner concluded that the Department was correct when it denied Alathea's request for all but 5 LPN hours per week. This appeal followed.

ELIGIBILITY CRITERIA

The Department of Health and Human Services is empowered to administer Maine's Medicaid program, MaineCare, and promulgate rules and regulations establishing conditions of eligibility. 22 M.R.S.A. § 3173. Pursuant to that authority, the Department has issued the MaineCare Benefits Manual (MCBM), which contains agency regulations for the administration of MaineCare.

Chapter II, section 67 of the MCBM contains standards for eligibility for on-site "nursing facility services." 10-144 C.M.R. ch. 101, ch. II, § 67. Alternatively, section 96 contains standards for receiving "private duty nursing" (PDN) services, which are services provided by a registered nurse (RN) or licensed practical nurse (LPN) in the member's residence. *Id.* § 96.01-3. Section 96 also provides for "personal care services," which include residential assistance with Activities of Daily Living (ADLs) by a certified nursing assistant (CNA), or other similar personnel. *Id.* § 96.01-4.

A MaineCare member who is eligible for nursing facility services under section 67.02-3 and who is under 21-years-old, is also eligible for private duty nursing (PDN) services, Level IV,[4] under section 96. *Id.* § 96.02-4(D). Under section 67.02-3 – and, thus, also applicable to section 96 – a person is eligible if he or she requires one of the following services every day:

. . .

---

[4] Level IV seems to refer to the level of the applicable cost cap, not the type or extent of services. Level IV members are entitled to $3,133 per month in services, but "can exceed the caps when it is medically necessary . . . ." *Id.* § 96, appendix #2.

> 2. nasogastric tube, gastrostomy, or jejunostomy feeding, for a new/recent (within past thirty (30) days) or unstable condition;
> . . .
> 6. professional nursing assessment, observation and management of an **unstable medical condition** (observation must, however, be needed at least once per shift throughout the twenty-four (24) hours); [or]
> . . .
> 11. direct assistance from others is required for the safe management of an **uncontrolled seizure disorder**, (i.e.: grandmal) at least weekly . . .

*Id.* § 67.02-3(A) (emphasis added). In this case, the parties do not dispute that the petitioner is entitled to receive PDN services based on the requirements above.

Once the threshold inquiry has been made – eligible for PDN or not – section 96 provides little guidance concerning how to determine the type and extent of services; specifically, whether a qualified member is entitled to receive RN or LPN services, and the appropriate number of hours for those services. Section 96 instructs that services ultimately provided must be "reasonable and necessary for meeting the medical needs of the individual, based upon the medical record, and upon the outcome scores on the MED form, and as authorized in the plan of care." *Id.* § 96.04. Eligible members may receive "as many covered services as are medically necessary," within certain limitations not applicable here. *Id.* § 96.03.

Also applicable here, an "unstable medical condition" exists when a member's condition is "fluctuating in an irregular way and/or is deteriorating and affects the Member's ability to function independently." *Id.* § 96.01-21. Section 96 instructs that a member with an "unstable medical condition" should receive "medical treatment and professional nursing observation, assessment and management at least once every 8 hours . . . ." *Id.*

DISCUSSION

6

In its appellate capacity, the Superior Court reviews agency decisions for "abuse of discretion, error of law, or findings not supported by the evidence." *Rangeley Crossroads Coal. v. Land Use Reg. Comm'n*, 2008 ME 115, ¶ 10, 955 A.2d 223.

In this case, no one disputes that Alathea is eligible for PDN services; the issue is the **extent** to which she is qualified. Petitioner argues that the Department committed an error of law when it denied the full 28 LPN hours based solely on the analysis of whether Alathea had an "unstable medical condition" under the MaineCare Rules, and that it should have considered her "uncontrolled seizure disorder" as well. Additionally, she argues that even if the court upheld the Department's legal analysis, the conclusion that Alathea did not have an "unstable medical condition" was unsupported by substantial evidence in the record.

As to Petitioner's first line of argument, the term "unstable medical condition" appears only in the definitions section of section 96 of the MCBM. The "definition" is puzzling because it seems to be part definition, part rule. It is a definition when it states that an "unstable medical condition" exists when a condition is "fluctuating in an irregular way and/or is deteriorating and affects the Member's ability to function independently." 10-144 C.M.R. ch. 101, ch. II, § 96.01-21. However, it seems to be a rule when the second sentence states: "The fluctuations are to such a degree that medical treatment and professional nursing observation, assessment and management at least once every 8 hours is required." It seems that the Department read this latter part as a rule and concluded that Alathea was not entitled to more frequent PDN services due to its conclusion that she did not have an "unstable medical condition."

7

However the Department interpreted the term, there is no indication that establishing an "unstable medical condition" is the only way within the rules to obtain the type of care Alathea seeks. That term does not appear anywhere outside the definitions section to substantively limit eligibility. Rather, the Department should have applied the more general standard within section 96: "Services provided must be reasonable and necessary for meeting the medical needs of the individual," *id.* § 96.04, and eligible members may receive "as many covered services as are medically necessary," *id.* § 96.03.

Thus, it was error for the Department to limit its inquiry to whether Alathea had an "unstable medical condition," and it should have considered more generally what was reasonable and necessary to manage her condition. That inquiry would almost certainly involve serious consideration of Alathea's uncontrolled seizure disorder[5] and special attention to the medical opinions of her doctors.

Alternatively, if the Court were to uphold the Commissioner's legal analysis, Petitioner argues that Alathea does have an "unstable medical condition." However, Respondent points to conflicting evidence that the Commissioner could have relied upon in reaching her conclusion that was apparently in the record but not in the actual

---

[5] Counsel for Petitioner argues that Alathea qualifies for more extensive services because she has an "uncontrolled seizure disorder" as defined in section 67.02-3. However, under that section, a person with "uncontrolled seizure disorder" is eligible for nursing facility services – and, thus, PDN Level IV services pursuant to section 96.02-4(D) – as an initial inquiry. Here, neither party disputes that Alathea is entitled to some degree of PDN Level IV services. Thus, while Alathea's uncontrolled seizure disorder would inform what care is reasonable and necessary, it does not in itself ensure any level of services.

findings.[6] The court may not substitute its judgment for that of the agency simply because "the evidence could give rise to more than one result." *Gulick v. Bd. of Envtl. Prot.*, 452 A.2d 1202, 1209 (Me. 1982). Rather, the court will defer to the Department's conclusion if it is based on evidence that "a reasonable mind might accept as adequate to support a conclusion." *Id.* If it reached that point, the Court would be bound to accept the Commissioner's legal and factual conclusion that Alathea did not have an "unstable medical condition." However, this point is unavailing due to the Court's conclusion that the Commissioner erred as a matter of law.

The entry will be:

The Court VACATES the Commissioner's March 15, 2012 decision.[7]

December 20, 2012

DATE

SUPERIOR COURT JUSTICE

---

[6] Respondent points to at least two places in the record that suggest Alathea's seizures are decreasing in severity or frequency, and that Diastat has been administered only infrequently. The Department also noted that there was no indication that physician involvement had increased or that medication or treatment had changed significantly.

[7] The Court recognizes that the issue is moot as to the eligibility period in question. However, the Law Court has stressed the importance of deciding moot issues when there are sufficient "collateral consequences" or "the issues are capable of repetition but evade review because of their fleeting or determinate nature." *Anthem Health Plans of Maine, Inc. v. Superintendent of Ins.*, 2011 ME 48, ¶ 8, 18 A.3d 824. The Court invites the parties to file any further requests for relief to the Court within 30 days.

Date Filed __4-19-12__ __CUMBERLAND__ Docket No. _AP-12-26_
County

Action __80C APPEAL__

ALTHEA BUSHNELL                              MARY MAYHEW, COMMISSIONER DHS

                                        vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| CHAD HANSEN ESQ<br>MAINE EMPLOYEE RIGHTS GROUP<br>92 EXCHANGE ST<br>2ND FLOOR<br>PORTLAND ME 04101<br><br>ADRIENNE HANSEN ESQ | JANINE RAQUET AAG |

Date of
Entry