ENTERED NOV 1 9 201

STATE OF MAINE
ANDROSCOGGIN, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. AP-13-16

MGK -CUM- 11-10-14

JENNIFER PETERS,

Petitioner

ORDER

v.

RECEIVED & FILED

NOV 1 0 2014

ANDROSCOGGIN
SUPERIOR COURT

COMMISSIONER, MAINE
DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

Respondent

This matter is before the court on Petitioner Jennifer Peters' Rule 80C appeal of the Decision of Respondent Maine Department of Health and Human Services ("DHHS"), which found that Ms. Peters is no longer eligible for coverage under the MaineCare Home and Community Based Benefits Program for Adults with Disabilities ("HCB Program"). Pursuant to 5 M.R.S. § 11001 et seq. and Rule 80C, Ms. Peters is asking that this court vacate the decision made by DHHS. Respondent DHHS has opposed Ms. Peters' Appeal. After hearing on May 7, 2014, review of the record and the parties' filings, the court denies Ms. Peters' Appeal for the reasons set forth below.

I. Factual and Procedural Background

The record on appeal provides the following:

Ms. Peters is 38-years-old and receives MaineCare. Ms. Peters suffers from numerous ailments, including, but not limited to neurofibromatosis II, three brain tumors, and cervical and lumbar spinal tumors. She is wheel chair dependent as a result of lack of sensation and motor activity of the left leg. She also suffers from psoriasis,

agoraphobia, post-traumatic stress disorder, bipolar disorder, fibromyalgia, legal blindness, poor balance, memory loss, hypersomnolence, depression, systemic Lupus Erythematosus, and obstructive sleep apnea. (App. Ex. 3.)

According to the Journal of the American Medical Association, "**Neurofibromatosis** (NF) is a genetic disorder causing skin abnormalities and tumors that form on nerve tissues." (App. Ex. 6)(Emphasis in the original). At the time of her assessment, Ms. Peters had recently undergone surgery to remove a tumor from underneath her fingernail. (HO Ex. 5.) The year before, she had a brain tumor removed. (*Id.*) She was also hospitalized earlier in the year for a reaction to medication. (*Id.*) Ms. Peters has inoperable tumors in her brain as well as in her thighs. (R. at 33:17-20.) At the hearing, Ms. Peters stated that her physical condition has deteriorated over the course of the last year. (R. at 33:13-16.) She conveyed that her physical condition is only expected to decline in the future. (R. at 33:9-16.)

RN Charlene McPhee, a representative from Goold Health Systems[1], assessed Ms. Peters for her eligibility for the HCB program. (HO Exs. 4, 5.) Ms. McPhee performs 18 assessments per week. (R. at 17.) On June 17, 2013, Ms. McPhee conducted the assessment with Ms. Peters and Ms. Peters' stepmother and personal support specialist ("PSS"), Deborah Girard, at Ms. Peters' apartment. (HO Ex. 5.) Ms. McPhee's assessment period covered from June 10, 2013 to June 16, 2013, and her findings are noted on the Medical Eligibility Determination ("MED") form dated June 17, 2013. (Dec. at 4; HO Ex. 5.) Ms. McPhee had no contact with Ms. Peters' medical providers. (R. at 25:17-26:4.)

---

[1] DHHS contracts with Goold Health Systems for it to perform assessments regarding in-home care cases. (R. at 7.)

2

Prior to June of 2013, Ms. Peters was eligible for and received services through the HCB Program, based on a prior DHHS assessment that found that Ms. Peters, a MaineCare recipient, requires extensive assistance with three out of five "Activities of Daily Living" ("ADL"). It was previously determined that she requires extensive assistance with transfers, locomotion and bed mobility. (App. Ex. 8.)

A reassessment of Ms. Peters HCB Program eligibility was conducted on June 17, 2013. At that time it was determined that Ms. Peters no longer requires extensive assistance with bed mobility. According to Ms. McPhee's notes, "She does need help putting her 'back leg' into bed at night. Consumer has no difficulty turning or situating herself in bed though she usually stays in one position by choice." (HO Ex. 5.) It was also determined that Ms. Peters does not require assistance with toileting. Ms. McPhee's assessment notes provide: "Consumer and her PSS state that she is totally independent in toileting. She occasionally has dribbling when she sneezes but does not use pull-ups or depends." (HO Ex. 5.) Based upon the June 17, 2013 reassessment, DHHS determined that Ms. Peters no longer met the minimum eligibility requirements for the HCB Program.

Ms. Peters receives home care from Ms. Girard. Up until the reassessment, Ms. Peters had received 40 hours a week of care. She now qualifies for 16.75 hours a week of care from a PSS through the MaineCare Private Duty Nursing/Personal Care Services program (PDN-Level III program). Ms. Peters will also receive help from a nurse for one hour per month.

Ms. Peters timely filed a request for an administrative hearing, which was held on September 30, 2013. Ms. Peters and Ms. Girard testified on Ms. Peters' behalf. Debra

3

Turner, R.N., an appeals specialist for Goold Health Systems, and Ms. McPhee testified on behalf of DHHS. On November 6, 2013, the Hearing Officer issued a Decision finding that DHHS was correct that Ms. Peters is no longer eligible for MaineCare coverage of her expenses under the Home and Community Based Benefits Program for Adults with Disabilities. The Hearing officer's Decision provides that Ms. Peters "is eligible for services under level III of the PDN Program." (Dec. at 3.)

Ms. Peters timely filed her Petition For Review of Agency Action.

II. Standard of Review

In its appellate capacity, the court reviews agency decisions for "abuse of discretion, error of law, or findings not supported by the evidence." *Rangeley Crossroads Coal. v. Land Use Reg. Comm'n*, 2008 ME 115, ¶ 10, 955 A.2d 223.

The burden of proof is on a petitioner to prove that "no competent evidence supports the [agency's] decision and that the record compels a contrary conclusion." *Bischoff v. Maine State Ret. Sys.*, 661 A.2d 167, 170 (Me. 1995). "Inconsistent evidence will not render an agency decision unsupported." *Id.* "Judges may not substitute their judgment for that of the agency merely because the evidence could give rise to more than one result." *Gulick v. Bd. of Envtl. Prot.*, 452 A.2d 1202, 1209 (Me. 1982).

The court must give great deference to an agency's construction of a statute it is charged with administering. *Rangeley Crossroads Coal.*, 2008 ME 115, ¶ 10, 955 A.2d 223. "A court will 'not vacate an agency's decision unless it: violates the Constitution or statutes; exceeds the agency's authority; is procedurally unlawful; is arbitrary or capricious; constitutes an abuse of discretion; is affected by bias or an error of law; or is unsupported by the evidence in the record.'" *Kroeger v. Dep't of Environmental Prot.*,

4

2005 ME 50, ¶ 7, 870 A.2d 566 (quoted in Alexander, *Maine Appellate Practice* § 452 at 312 (4th ed. 2013)); *see also* 5 M.R.S.A. § 11007(4)(c).

Where there have been multiple levels of administrative decision-making, the most recent decision will be the one subject to Superior Court review, if the most recent decision-maker had *de novo* capacity and/or the authority to conduct additional fact-finding. *See* Alexander, *Maine Appellate Practice* § 455(b) at 315; *see also Concerned Citizens to Save Roxbury v. Bd. of Envtl. Prot.*, 2011 ME 39, ¶ 17, 15 A.3d 1263.

III. Discussion

Pursuant to 22 M.R.S.A. § 3173, DHHS is "authorized to administer programs of aid, medical or remedial care and services for medically indigent persons." DHHS is required to operate a Medicaid program for disabled persons. *See* § 3174-G(1)(C) (providing that DHHS "shall provide for the delivery of federally approved Medicaid services to the following persons: A qualified elderly or disabled person when the person's family income is equal to or below 100% of the nonfarm income official poverty line . . . .") DHHS is also empowered "to make all necessary rules and regulations consistent with the laws of the State for the administration of these programs including, but not limited to, establishing conditions of eligibility . . . . " § 3173.

The MaineCare Benefits Manual and the MaineCare Eligibility Manual contain regulations propagated by the Department to manage MaineCare benefits. Section 19 of the MaineCare Benefits Manual concerns home and community benefits for the elderly and for adults with disabilities. "Home and Community Benefits for the Elderly and Adults with Disabilities (HCB) are in-home care and other services, designed as a package, to assist eligible members to remain in their homes, or other residential

5

community settings, and thereby avoid or delay institutional nursing facility care." 10-144 C.M.R. Ch. 101, Ch. II, § 19.

DHHS determines whether an individual is medically eligible to receive HCB services through a medical eligibility determination (MED) assessment. *Id.* The assessment may be performed either by DHHS or an authorized agent. *Id.* The Manual provides:

A person meets the medical eligibility requirements for HCB if he or she meets the medical eligibility requirements specified in Chapter II, Section 67.02, Nursing Facility Services, of this manual. The Department, or its Assessing Services Agency, using the medical eligibility determination (MED) form must complete a face-to-face assessment. The clinical judgment of the ASA shall be determinative of the scores given on the MED assessment.

10-144 C.M.R. Ch. 101, Ch. II, § 19.02-2.

There are several different criteria used in Section 67.02-3 to determine whether an individual is eligible for a nursing facility level of care, in this case Ms. Peters' eligibility hinges upon whether or not she requires extensive assistance in three out of five activities of daily living ("ADLs").[2] 10-144 C.M.R. Ch. 101, Ch. II, § 67.02-3(A)(12). Section 67.02-3(A)(12) provides that

A person meets the medical eligibility requirements for NF services if he or she needs at least one (1) of the following services seven (7) days per week (unless otherwise specified) that are or otherwise would be performed by or under the supervision of a registered professional nurse: . . .

---

[2] The court notes that in the Respondent's Brief DHHS cites to § 67.02-3(B)(1), (2) and (3). In order to qualify under § 67.02-3(B), Ms. Peters would be required to show that "she needs a combination of at least three (3) of the following services described in 67.02-3(B) below, including at least one (1) of the nursing services described in 67.02-3(B)(1), that are or otherwise would be performed by or under the supervision of a registered professional nurse." Ms. Peters has clarified that she is not seeking eligibility under § 67.02-3(B) since she admits that she does not need the nursing services listed. Therefor, the proper section of the regulations to consider is § 67.02-3(A).

extensive assistance or total dependence with three (3) of the following five (5) activities of daily living: a) bed mobility; (b) transfer; (c) locomotion; (d) eating; and (e) toilet use (refer to 67.02-3(B)(2) below).

Section 19.01-15 provides extensive assistance:

means although the individual performed part of the activity over the last seven (7) days, or twenty-four (24) to forty-eight (48) hours if in a hospital setting, help of the following type(s) was provided:
- Weight-bearing support three (3) or more times, or
- Full staff performance of activity (three (3) or more times) during part (but not all) of the last seven (7) days.

The Department found that Ms. Peters requires extensive assistance with two out of the five relevant ADLS: locomotion and transfers. The Department did not find that Ms. Peters requires extensive assistance with bed mobility, eating, or toilet use. She does not contest that she does not require extensive assistance with eating. Ms. Peters' eligibility for the HCB Program hinges upon whether she requires extensive assistance with either bed mobility or toileting. Ms. Peters contests the Department's determination that she is independent with regard to toilet use and that she does not require assistance in the area of bed mobility. She avers that she requires extensive assistance in toileting and bed mobility. Ms. Peters' also contends that the 2012 Goold assessment should have a res judicata effect regarding Ms. Peters' conditions, with the only possible exception being for new evidence of a change in Ms. Peters' diagnosis or conditions.

**Bed Mobility**

Under Section E (physical functioning/structural problems) of the Medical Eligibility Determination Form ("MED Form"), ADL self-performance and ADL support are numerically evaluated. (HO Ex. 5.) Numbers zero through eight are used to indicate different levels or types of support or whether an activity did or did not occur. (*Id.*) For the evaluation of ADL self-performance, setup is not included. (*Id.*) In Section E, Bed

7

Mobility is defined as it is also defined in Section 67.02-3(B)(2)(a) of the Manual: "How person moves to and from lying position, turns side to side, and positions body while in bed." (HO Ex. 5); § 67.02-3(B)(2)(a). Getting in and out of bed is covered under the Transfer section. (*Id.*) Ms. McPhee indicated that Ms. Peters is independent with bed mobility and that she requires no setup or physical help from staff. (*Id.*)

In contrast, Ms. Peters and Ms. Girard discussed the assistance Ms. Peters requires in the morning and the evening getting in and out of bed and positioning in bed in the evening. In her testimony, Ms. Peters described how Deborah Girard manipulates her in and out of bed in the morning and at night, and how Ms. Girard positions her in the bed at night to prepare for sleep. (R. at 41-42.) Ms. Girard stated that Ms. Peters requires her assistance to get out of bed in the morning, to get into bed at night, and to be properly positioned in the bed. (R. at 57-59.) In particular, Ms. Peters requires help lifting and positioning the leg that she cannot lift. (R. at 59:3-17.) Ms. Peters argues that her medical record from her nurse practitioner shows that her physical condition always affects her ability to change positions while she is lying down, and her medical record from her occupational therapist shows that she has an impaired ability to shift positions while lying down at home in bed. (*See* App. Ex. 2 at 2; App. Ex. 4 at 2.) Ms. Peters also points out that both her nurse practitioner and her treating physician noted leg weakness. (App. Ex. 2 at 1 (noting "lack of sensation & motor activity of left leg"); App. Ex. 3 at 1.) The medical records presented by Ms. Peters at the administrative hearing were from after her assessment date, but appear to reflect her condition either during or fairly close in time to the assessment period. (App. Exs. 1-5.)

8

Ms. Peters argues that the Hearing Officer did not give her medical sources the appropriate weight. In particular, she argues that under 20 C.F.R. § 404.1527 her primary care physician's opinion should have been given more weight. *See* 20 C.F.R. § 404.1527 ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) . . . .") The section of the C.F.R. that Ms. Peters cites to, however, pertains to determinations regarding whether an individual is disabled for purposes of receiving disability benefits. This case does not involve a determination of whether or not Ms. Peters, who is already receiving MaineCare, and who is eligible for the PDN-III program, is or is not disabled. The court finds § 404.1527 instructive, and concurs that medical evidence from treating sources is informative, however, the HCB Program assessment process involves a limited time period where the "clinical judgment of the ASA shall be determinative of the scores given on the MED assessment." (10-144 C.M.R. Ch. 101, Ch. II, § 19.02-2.) The Hearing Officer admitted Ms. Peters' medical records into evidence, over the objections of DHHS, but it appears that the records did not persuade her that Ms. Peters requires extensive assistance with toileting or bed mobility.

The Hearing Officer noted that the medical records do not reflect that Ms. Peters has conveyed that she requires help with bed mobility to her providers. (Dec. at 7.) She mentioned that Dr. Tan's notes mention that Ms. Peters requires assistance with preparing her food, medications, and bath or shower, but the notes do not mention that Ms. Peters needs assistance with bed mobility or toilet use. (Dec. at 8.; App. Ex. 3 at 1). The court

9

notes, however, that Dr. Tan's list of activities Ms. Peters requires assistance with includes the proviso "including, but not limited to". (App. Ex. 3 at 1.)

Ms. McPhee's findings and testimony directly contradicted Ms. Peters and Ms. Girard's testimony. Ms. McPhee's findings regarding bed mobility were also discussed during the administrative hearing:

"Ms. Turner: You have written here that you were told by Ms. Peters and her PSS that she was independent in bed mobility that she didn't have any difficulty moving in bed.

Ms. McPhee: Right that is what she said." (R. at 18:12-15.)

Ms. Peters contends that Ms. McPhee failed to testify at the administrative hearing regarding whether Ms. Peters can sit up in bed or lay down in bed independently, and that the Hearing Officer failed to address the issue of whether Ms. Peters can "move [] to and from lying position." § 67.02-3(B)(2)(a). Ms. McPhee did address the issue of bed mobility more broadly, however, when she conveyed that she was told that Ms. Peters is independent with bed mobility. Her notes also reflect Ms. McPhee's independence with "turning or situating herself in bed." (HO Ex. 5.) In addition, Ms. McPhee stated in her notes that "Task times were reviewed three times as were all ADL capabilities. All present were in agreement with them and contributed in developing the task times." (*Id.*) Ms. McPhee agreed at the administrative hearing that she had no personal stake in the outcome of assessments. (R. at 22-23.)

With regard to bed mobility, the Hearing Officer wrote, "I do not find Ms. Peters and Ms. Girard Credible." (Dec. at 7.) The Hearing Officer, did however, find Ms. McPhee's testimony regarding bed mobility credible.

10

Although Ms. Peters' arguments and the evidence from medical providers are compelling, the court is constrained to find that the hearing officer's determination is supported by evidence presented by Ms. McPhee. Accordingly, the court declines to vacate the hearing officer's determination regarding bed mobility.

**Toileting**

There were similar differences of opinion among Ms. Peters, Ms. Girard and Ms. McPhee on the issue of toileting. Under Section E of the Med Form, Toilet Use is described as "How a person uses the toilet room (or commode bedpan, urinal); transfers on/off toilet, cleanses, changes pad, manages ostomy or catheter, adjusts clothes." (HO Ex. 5); § 67.02-3(B)(2)(e). Ms. McPhee indicated that Ms. Peters was independent and required no setup or physical help in the area of toilet use. (HO Ex. 5.)

Ms. Peters stated that during the assessment period she required assistance with toileting from Ms. Girard approximately one to two times per day. (R. at 42:16-44:2.) Ms. Girard conveyed that she assists Ms. Peters with toileting by bearing her weight as she gets on and off the toilet, and that she does so four or five times over the course of time that she is at Ms. Peters' apartment. (R. at 59:18-61: 4.)

When asked by the Hearing Officer about her assessment that Ms. Peters toilets independently, Ms. McPhee testified that Ms. Peters and her stepmother both stated that she independently toilets. When asked if she had any reason to doubt that, Ms. McPhee said, No.

The Hearing Officer also inquired, "And when you asked about toileting do you say do you toilet independent [sic] or do you go through all the motions of up and down

11

from the toilet, cleaning, that sort of thing? Ms. McPhee answered, "I go through all the motions." (R. at 20:12-20.)

Ms. Peters contends that the Hearing Officer misinterpreted the cleaning and adjusting clothes section of the toilet use category. Ms. McPhee stated that a patient who suffered from frequent incontinence, needed someone to help her change depends or pull-ups, and required someone to wash her would require extensive assistance, therefore, Ms. Peters argues that since she sometimes suffers from dribbling incontinence that necessitates a change of underpants she should also be considered in need of extensive assistance in toilet use. (R. at 24:5-7.) Ms. McPhee's testimony, however, was that Ms. Peters "can change her own underpants and not [sic] considered that she needs excessive help." (R. at 24:1-2.)

Ms. Girard and Ms. Peters' testimony did not persuade the Hearing Officer. To the contrary, the Hearing Officer found that Ms. Peters is required to use the toilet independently on weekends. Ms. Peters is also on her own in the later afternoon and evenings, the times when Ms. Peters stated she needs assistance with toilet use. (Dec. 7-8.) In addition, the Hearing Officer found that Dr. Tan's office notes do not state that Ms. Peters needed assistance with toilet use or bed mobility. (App. Ex. 3 at 1; Dec. at 8.)

The court acknowledges Ms. Peters' serious medical conditions, and is sympathetic to her arguments. That finding notwithstanding, the court is constrained by the great deference it must afford DHHS in its determination if there is any credible evidence to support the agency's decision. *See Bischoff*, 661 A.2d 167, 170 (Me. 1995); *see also Gulick,* 452 A.2d 1202, 1209 (Me. 1982). Based on the aforementioned standard of review, the evidence presented by Ms. Peters at the administrative hearing was neither

12

persuasive nor sufficient to convince the Hearing Officer to overturn DHHS's Decision regarding toilet use.

**Res Judicata and Collateral Estoppel**

Ms. Peters has also advanced a res judicata/collateral estoppel argument.

Res judicata applies when: (1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; (3) the matters presented for decision in the second action were, or might have been, litigated in the first action...; and (4) both cases involve the same cause of action ... The doctrine of res judicata applies to prior administrative proceedings, provided that such proceedings contain the essential elements of adjudication.

*Town of Ogunquit v. Cliff House & Motels, Inc.,* 2000 ME 169, ¶¶ 10-11, 759 A.2d 731 (quotations omitted). Ms. Peters contends that DHHS should be bound by its 2012 decision. She argues that since her condition has not changed, and the evaluation criteria have remained the same, DHHS should be bound by its 2012 decision that she is eligible for the HCB Program. DHHS has stated that her claim is more precisely a collateral estoppel claim, since Ms. Peters' case does not involve the litigation of the exact same claim, but rather a question of whether the same factual issue is being determined once again. *See Portland Water Dist. v. Town of Standish*, 2008 ME 23, ¶ 9, 940 A.2d 1097 (quotations and citations omitted) (stating that collateral estoppel "prevents the relitigation of factual issues already decided if the identical issue was determined by a prior final judgment, and the party estopped had a fair opportunity and incentive to litigate the issue in a prior proceeding... Collateral estoppel can be applied to administrative proceedings . . .") DHHS maintains that the same issue is not being decided once again, and therefore collateral estoppel is inapplicable.

In *Kelley v. Maine Pub. Employees Ret. Sys.*, the Law Court determined that collateral estoppel was not applicable in a case involving a review of the petitioner's

13

eligibility for disability retirement benefits based upon whether she was capable of substantial gainful activity. 2009 ME 27, ¶¶ 22-23, 967 A.2d 676. The court wrote,

> Collateral estoppel does not apply here, however, because the facts at issue in MPERS's 1998 decision are undeniably different from those at issue in 2006. Collateral estoppel only prevents the relitigation of factual issues when the identical issue was already determined by a prior final judgment. In 1998, the issue was whether Kelley's lower back problem, *as it existed in 1998,* prevented her from engaging in substantially gainful activity. In 2006, the issue was whether Kelley's lower back problem, *as it existed in 2006,* prevented her from engaging in substantially gainful activity.

2009 ME 27, ¶ 22, 967 A.2d 676. The court also noted that the retirement disability statutes "anticipates and allows for periodic review of the circumstances of individuals who receive disability benefits. After each review, MPERS makes a new factual determination on whether benefits should continue." *Id.* at 23. The court noted that the application of collateral estoppel in such a case would conflict with the statutory requirement that the agency conduct periodic reviews. *Id.*

DHHS has also noted that it is required to conduct periodic re-reviews by federal law *See* 42 C.F.R. § 441.302(c)(2) (requiring at least annual re-evaluations). State regulations also reflect that individuals may have multiple assessments over time, there are defined eligibility periods, and reassessments are required prior to the end of an eligibility period. *See* 10-144 C.M.R. Ch. 101, Ch. II, §§ 19.03 and 19.07.

The court finds that the doctrines of res judicata and collateral estoppel are inapplicable to this case. The two eligibility determinations were required by the regulations. Simply put, the 2012 decision was a determination regarding Ms. Peters' eligibility in 2012 and was based upon her condition at the time of that assessment; and, the 2013 decision was a determination regarding Ms. Peters' eligibility in 2013 and was based upon her condition at the time of the 2013 assessment.

14

Accordingly, the court **ORDERS** that Petitioner's Appeal is **DENIED**.

The clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: ___11/10/14___

_____
MaryGay Kennedy
Justice, Superior Court

Date Filed 12-10-13     Androscoggin     Docket No. AP-13-16

Action:  80C Appeal

JENNIFER PETERS     VS.     COMMISSIONER, MAINE DEPT OF
HEALTH AND HUMAN SERVICES

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Frank D'Alessandro, Esq. | Janine Raquet, Esq. |
| PineTree Legal | Asst Attorney General |
| P.O. Box 547 | 84 Harlow Street 2nd Fl |
| Portland, ME 04112 | Bangor, ME 04401 |

Date of Entry

Dec 10     Received 12-10-13:
Petition for Review of Agency Action filed.

Dec 17     Received 12-17-13:
Entry of appearance of Janine Raquet, Esq. as counsel for respondent.

Dec 18     Received 12-18-13:
Certified Return mail receipt served on December 12, 2013 on DHHS and Attorney
General's Office filed.

Jan 8     Received 01-08-14:
Certified Record filed.

Jan 8     On 01-08-14:
Notice and Briefing Schedule filed.
Petitioner's brief is due on or before February 19, 2014.
Copies to counsel on 1-8-14.

Feb 19     Received 2-19-14:
Petitioner's Brief filed.

Mar 7     Received 03-07-14:
Respondent's Motion to Correct Record with Incorporated Memorandum of Law and
proposed order filed.

Mar 10     On 03-10-14:
As to Motion to Correct Record, motion granted. (Kennedy, J)
Copies mailed to parties.